James A. **RUTLEDGE** and **Mattie L. Rutledge, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 28432.**

United States Court of Appeals, Fifth Circuit.

June 22, 1970.

———◆———

Donald E. Walter, U. S. Atty., Shreveport, La., John O. Jones, Tax. Division, U. S. Department of Justice, Fort Worth, Tex., Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, David E. Carmack, Grant W. Wiprud, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for appellant.

Robert L. Curry, III, William D. Brown, Monroe, La., for appellees.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

This case requires us to determine the proper tax treatment of income received by taxpayer[1] under contracts permitting

---

1. "Taxpayer" refers to James A. Rutledge. His wife, taxpayer Mattie L. Rutledge, did not participate actively in the transactions involved here.

the removal of sand and gravel from two tracts of taxpayer's land. As in Wood v. United States, 5 Cir., 1967, 377 F.2d 300, cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967), the issue presented here is whether the contracts were in essence sales of minerals in place or were mineral leases. If these were sales agreements, the payments received by taxpayer constituted proceeds from the sale of capital assets and were taxable as capital gain. On the other hand, if these were lease agreements, the payments were taxable as ordinary income subject to an allowance for depletion.

This is a tax refund suit brought by James A. Rutledge and his wife against the United States to recover income taxes and interest assessed against them and collected by the Commissioner of Internal Revenue in the amount of $27,-805.86 for the taxable years 1963, 1964 and 1965. The case was tried to a jury, which answered special interrogatories in favor of taxpayer, and the District Court entered a judgment on the jury's verdict. At the end of taxpayer's case and then at the close of all the evidence, the Government moved for a directed verdict. Upon the entry of the judgment, the Government moved for a judgment notwithstanding the verdict or, alternatively, a new trial. All these motions were denied, and the Government appeals from the judgment and the order overruling its motion for a judgment n.o.v. or new trial.

As a matter of law, we conclude that the payments taxpayer received for the sand and gravel extracted from his land were correctly taxed as depletable ordinary income rather than as capital gain. Wood v. United States, 5 Cir., 1967, 377 F.2d 300, cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967). The judgment appealed from must therefore be reversed, and judgment entered in favor of the Government.

## I.

Taxpayer owned a 328-acre tract in Ouachita Parish, Louisiana. On March 11, 1959, he executed a "lease" agreement on a standard form with C. O. Horton and R. T. Henry. This agreement entitled Horton and Henry, the "lessees," to remove sand and gravel from the 328-acre tract in consideration of (1) specified "royalty" payments to be made for each cubic yard of material removed and marketed and (2) payment of certain "advance royalties." The payments for each cubic yard removed and marketed were 15 cents for sand, 25 cents for pit-run gravel, and 35 cents for washed gravel. The monthly "advance royalty" was $200 for the first year and $416.66 for each subsequent year. The advance payments were to be offset against cubic yardage payments for materials removed, and yearly production was limited to the amount that would yield $25,000 in royalties payable to taxpayer. The"lease" was to be in effect for a term of ten years and so long thereafter as production continued. If operations did not yield at least $5,000 a year, however, by the mutual agreement of the parties the "lease" was to be automatically cancelled.

The Horton-Henry partnership proceeded to mine and remove sand and gravel from the 328-acre tract, and taxpayer was duly paid according to the terms of the "lease." The parties referred to the payments made to taxpayer as "rentals" or "royalties."

Subsequently, the "lease" was superseded by a "sale" agreement dated December 22, 1959, which purported to convey the 328-acre tract.[2] This agreement named taxpayer as the "vendor" of the tract and Ouachita Gravel Company (the corporate successor to the Horton-Henry partnership) as the "vendee." The consideration for the purported sale of the tract to the gravel company was stated to be (1) the same payments for

---

2. On its face the agreement purports to convey the tract itself. Taxpayer argues that errors were committed in describing the subject property, which was intended to be the sand and gravel. We agree with taxpayer that these "errors" are not material to the question presented to this Court.

each cubic yard of materials removed which had been provided for in the "lease" agreement and (2) the monthly advance payments that the "lease" had specified for the second and subsequent years.[3] The instrument further provided that, if the gravel company failed to make any of the payments called for in the "consideration clause," the contract would be cancelled and the gravel company would be obligated "to immediately execute a reconveyance of all the property herein transferred, without cost," to taxpayer. In addition, it was agreed that the transfer of the tract would in any event terminate after twenty years, even if the gravel company had not removed all the sand and gravel from the tract before the termination date. The gravel company was granted an "easement or right-of-way" over the land purportedly conveyed. Taxpayer was to continue to pay ad valorem taxes on the land, and the gravel company was to pay all state severance taxes on the material removed. In a letter also dated December 22, 1959, taxpayer referred to the twenty-year limitation on production in the "sale" agreement and stated, "I now agree that such term shall be extended with the limitation as long as sand and gravel is mined

and produced from the premises in commercial quantities." The gravel company was not obligated to remove any minimum amount of sand or gravel under the agreement, as amended.[4]

The gravel company mined the 328-acre tract, and taxpayer duly received the minimum advance payments and the cubic yardage payments.[5] Taxpayer had nothing to do with the subsequent disposition of the sand and gravel after it had been extracted by the gravel company.

Taxpayer and his three brothers each owned an undivided one-fourth interest in an 80-acre tract situated immediately south of land owned by the Ouachita Gravel Company. In the spring of 1964, one of taxpayer's brothers negotiated an oral agreement with the gravel company regarding this tract. Under this agreement the gravel company was granted the right to extract sand and gravel from the tract in return for paying the moved. The gravel company was not re-brothers 30 cents for each cubic yard required to make minimum advance payments or to mine any minimum part of the 80 acres. The parties agreed that the gravel company would mine the tract in strips measuring 100 feet by 300 to 500 feet. Once the gravel company had

3. Taxpayer characterizes the advance payments provision as obligating the gravel company to pay approximately $5,000 a year (12 x $416.66) for the sand and gravel, whether or not extracted. The "sale" agreement provided that the monthly payment "is an advance payment for the sand and gravel to be mined from the [tract]; and Vendee shall have the privilege of removing a sufficient amount of sand and gravel at the [contract price], without cost, in order to equalize the advance payments; and for this purpose, said advance payment shall be considered as cumulative."

4. Regarding the circumstances attending the execution of the "sale" agreement, testimony was given to the following effect: At some time before December 22, 1959, taxpayer was informed that the gravel company found it economically burdensome to continue its operations with draglines. The gravel company thought a switch to a dredging method

of extraction was necessary. Because the economics of a dredging operation required greater production than the amount contemplated by the "lease" agreement, the gravel company informed taxpayer that it would purchase his sand and gravel, entitling him to capital gains, if he would agree to remove the limitation on production. The purpose of the "sale" agreement and the intent of the parties was to transfer title to the sand and gravel in place to the gravel company so that taxpayer would receive capital gain treatment. The contract employed tracked the contract involved in the decision in Crowell Land & Min. Corp. v. Commissioner of Internal Revenue, 5 Cir., 1957, 242 F.2d 864.

5. Testimony was given to the effect that the requirement of minimum monthly advance payments is typical of sand and gravel leases and of other mineral leases as well.

removed the overburden from a strip, it was obligated to pay for all the merchantable sand and gravel in the strip. The agreement was terminable at the will of either party.[6] The brothers terminated the agreement in 1967 after approximately 35 acres had been mined.

No determination was made of the size and extent of the sand and gravel deposits in either the 328-acre tract or the 80-acre tract before the agreements involving these tracts were executed.

In the District Court taxpayer contended that the payments he received from the gravel company during the years 1963–1965 were proceeds from the sale of capital assets held for more than six months. The Government responded that the payments were royalties paid under leases of the tracts containing the sand and gravel deposits. More specifically, the Government urged that, as a matter of law, taxpayer had retained an economic interest in the deposits under the leasing arrangements with the gravel company. Consequently, the Government moved for a directed verdict at the close of taxpayer's case in chief and again at the close of all the testimony. The District Judge, however, submitted the case to the jury on special interrogatories inquiring whether taxpayer had disposed of his entire economic interest in the two tracts and charged the jury regarding the criteria that should govern their verdict.

We conclude that taxpayer retained an "economic interest," Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Treas. Reg. § 1.611–1(b) (1), in the sand and gravel in place in the two tracts. Accordingly, we hold that the proceeds of the agreements with the gravel company were ordinary income to taxpayer, subject to an allowance for depletion. Wood v. United States, 5 Cir., 1967, 377 F.2d 300; United States v. Green, 5 Cir., 1967, 377 F.2d 550; United States v. Peeler, 5 Cir., 1967, 377 F. 2d 531. See also Royalton Stone Corporation v. Commissioner of Internal Revenue, 2 Cir., 1967, 379 F.2d 298; Laudenslager v. Commissioner of Internal Revenue, 3 Cir., 1962, 305 F.2d 686; Oliver v. United States, 4 Cir., 1969, 408 F.2d 769; Belknap v. United States, 6 Cir., 1969, 406 F.2d 737; Schreiber v. United States, 7 Cir., 1967, 382 F.2d 553; Rabiner v. Bacon, 8 Cir., 1967, 373 F.2d 537; Alkire v. Riddell, 9 Cir., 1968, 397 F.2d 779, United States v. White, 10 Cir., 1968, 401 F.2d 610 (en banc).

## II.

■ The concept of "economic interest" upon which this case turns was so labeled by the Supreme Court in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). *See generally* Sneed, The Economic Interest—An Expanding Concept, 35 Texas L.Rev. 305, 309–316 (1957). In *Palmer* taxpayer was a lessee under an oil and gas lease who conveyed certain of his lease interests to a third party. The issue presented was whether taxpayer was entitled to an allowance for depletion on the consideration paid him by the third party. The Court held that he was entitled to depletion since he had retained by his stipulation for royalties with the third party "an economic interest in the oil [and gas], in place, which is depleted by production." 287 U.S. at 557, 53 S.Ct. at 227. The two requisites of an "economic interest" established by *Palmer* are (1) that the taxpayer have acquired by investment an interest in the mineral in place, and (2) that he then look to the extraction of the mineral for the return of his capital. *See* Commissioner of Internal Revenue v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956). Although the "economic interest" concept was developed and refined primarily in cases dealing

6. Taxpayer and the Government disagree regarding whether the brothers could terminate the agreement and require cessation of mining in the middle of a strip, as the Government argues, or could terminate only after mining of a strip had been completed, as taxpayer argues. In any event, the brothers could terminate after a strip was completely mined.

with oil and gas, we have observed that there is "no apparent justification for a difference in approach depending upon the nature of the mineral involved," and have proceeded to apply the "economic interest" test to cases dealing with hard minerals such as sand and gravel. Wood v. United States, 5 Cir., 1967, 377 F.2d 300, 304. *See also* Gitzinger v. United States, 6 Cir., 1968, 404 F.2d 191, 193 n. 1; United States v. White, 10 Cir., 1968, 401 F.2d 610, 614 (en banc); Irwin, Selected Current Tax Problems of Oil and Gas Landowners and Lessors, Sw. Legal Foundation 19th Inst. on Oil & Gas Law & Tax. 295, 296–309 (1968). We apply that test here.

▇ Cases decided subsequent to Palmer have made clear that the test for determining whether proceeds are taxable as capital gain or as ordinary income is the same as that for determining whether, as in *Palmer*, proceeds are subject to the allowance for depletion. *E. g.*, Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946); Anderson v. Helvering, 310 U.S. 404, 407–408, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940); Wood v. United States, 5 Cir., 1967, 377 F.2d 300, 305. As in the *Wood* case, the second part of the test is of critical importance here. Taxpayer claims to have divested himself of his economic interest in the minerals in place in the two tracts by means of a capital sale and seeks to treat the proceeds as capital gain. We must ask whether he looks to extraction or the mineral for his return. If he looks solely to extraction for his return, we cannot say that he has divested himself of his economic interest in the minerals in place. If he has retained an economic interest, he is not entitled to treat his return as capital gain. Wood v. United States, 5 Cir., 1967, 377 F.2d 300; *see, e. g.*, Commissioner of Internal Revenue v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 399, 100 L.Ed. 347 (1956); Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938); Oliver v. United States, 4 Cir., 1969, 408 F.2d 769, 771.

The tax consequences of the transactions in this case are dictated by this Court's decision in Wood v. United States, 5 Cir., 1967, 377 F.2d 300. In *Wood* the taxpayer executed a "lease" agreement giving the "lessee" the right to extract sand, gravel, and rock from taxpayer's land for an indefinite period. In return, taxpayer was to receive a fixed payment of 25 cents per cubic yard removed. So long as production continued, the "lessee" guaranteed an annual minimum payment of $15,000. Taxpayer contended that the transaction was a sale disposing of his interest in the deposit and yielding capital gain. We rejected that contention. Because the cubic yardage payments depended solely upon production, we held that taxpayer had retained his economic interest in the minerals in place under a "typical" hard mineral lease. We stated:

" * * * Under the economic interest test, the critical consideration is whether payment is dependent upon extraction, not the method by which that payment is calculated. Thus, the difference in the typical measurement of payment under oil and gas and hard mineral leases should not affect the application of the economic interest test.

"Taxpayer next argues that, even if the royalty payments are based upon production, the presence of minimum guaranteed royalty provisions in the agreement, requires a finding that his income was not based solely upon production as required by the economic interest test. This contention is without merit as the courts have stated many times that a minimum royalty, such as that present in this case, is *merely an advancement for future payments in the form of a guarantee and does not render payment dependent upon a factor other than extraction or production.*"

377 F.2d at 306–307 (footnotes omitted) (emphasis added); *see* Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed.

199 (1932); Albritton v. Commissioner of Internal Revenue, 5 Cir., 1957, 248 F.2d 49; Laudenslager v. Commissioner of Internal Revenue, 3 Cir., 1962, 305 F.2d 686, 691; Gitzinger v. United States, 6 Cir., 1968, 404 F.2d 191; Freund v. United States, 7 Cir., 1966, 367 F.2d 776. *See also* Treas. Reg. §§ 1.611–1(b), 1.612–3(b) (1960). Like the payments in *Wood*, the payments made to taxpayer here depended solely upon the actual extraction of sand and gravel from the two tracts. In no sense can the formula for payment adopted by taxpayer and the gravel company be considered, for tax purposes, as a form of deferred payment for the sale of the minerals in place.

■■ Taxpayer would have us distinguish *Wood* from this case on the ground that *Wood* involved an agreement labeled as a "lease", but the agreements here were "sales." We are of the opinion, however, that the labels used by the parties in framing their agreements regarding the extraction of minerals from the 328- and 80-acre tracts do not determine whether taxpayer retained an economic interest in the minerals in place in the two tracts. Tax consequences of transactions are to be governed by their substance, not their form. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); American National Bank of Austin v. United States, 5 Cir., 1970, 421 F.2d 442, 451. Indeed, the question with which courts must often be concerned is "whether the intent and acts of the parties should be disregarded in characterizing their transactions for tax purposes." American National Bank of Austin v. United States, 5 Cir., 1970, 421 F.2d 442, 453; United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980, 982–983; Kraft Foods Company v. Commissioner of Internal Revenue, 2 Cir., 1956, 232 F.2d 118, 123. As we said in *Wood*, in determining the proper tax treatment of payments made under agreements labeled as "sales" agreements and those labeled as "leases," we "do not view such distinc-

tion [in wording] as properly determinative of tax consequences under the economic interest test." 377 F.2d at 311 n. 26.

Taxpayer argues that this Court's decision in Crowell Land and Min. Corp. v. Commissioner of Internal Revenue, 5 Cir., 1957, 242 F.2d 864, requires the conclusion here, at least with respect to the transaction involving the 328-acre tract, that taxpayer disposed of his entire economic interest in the minerals in place. We disagree. In *Crowell* the taxpayer entered into an agreement for the extraction of sand and gravel from his land. The agreement was termed a "Contract of Sale," and the parties were referred to as "vendor" and "vendee." The contract provided for minimum payments to taxpayer each year, together with future payments measured by a fixed price per cubic yard of sand and gravel removed. The Court, in holding that taxpayer was entitled to treat payments received under the agreement as capital gains from the sale of a capital asset, stated:

" * * * A bona fide sale was the intent of the parties and it was expressed in terms free from ambiguity throughout the instrument in the provisions and conditions it set out. Looking to the actual circumstances as well as the language of the contract of sale, there is no occasion or basis for resorting to legal niceties of interpretation to defeat the basic purpose and effect of the transaction. * * * "

242 F.2d at 866. To be sure, the ultimate question of tax law before the Court in *Crowell*—how payments received under agreements calling for the extraction of hard minerals are to be treated for tax purposes—was the same as that presented here, and the contract involving the 328-acre tract purported to follow the agreement examined in *Crowell*. It does not appear from the *Crowell* opinion, however, that the parties there raised, or that the Court considered, the dispositive issue presented here—that is, whether the economic realities of the case require that we disregard the in-

tent and acts of the parties insofar as is necessary for a proper determination of the tax consequences of their transactions. *See, e.g.,* American National Bank of Austin v. United States, 5 Cir., 1970, 421 F.2d 442; United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980. We believe that proper application of the economic interest test under the circumstances of this case requires that we look beyond the language of the agreements in issue. Accordingly, we conclude that taxpayer retained his economic interest in the minerals in place in the two tracts. The purported conveyance of sand and gravel in place, under the circumstances here, was in substance nothing more than a grant of operating rights to mine hard minerals at a fixed unit price for materials removed. It was not, for tax purposes, a sale of capital assets.

Reversed.