ESTATE OF MARIAN H. WALKER, DECEASED, IRVIN C. WALKER AND ELSIE WALKER BARNES, CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6322–66, 1677–69, 360–70. Filed December 17, 1970.

*Courtney H. Cummings, Jr.*, for the petitioners.
*Giles J. McCarthy*, for the respondent.

The Commissioner determined the following deficiencies in the income tax of Marian H. Walker, up to the date of her death on October 3, 1966, and in the income tax of her estate for the period thereafter:

| Year or taxable period | Deficiency |
| --- | --- |
| 1963 | $4, 482. 56 |
| 1964 | 6, 067. 82 |
| 1965 | 11, 816. 43 |
| 1/1/66–10/3/66 | 8, 398. 64 |
| 10/3/66–12/31/66 | 3, 857. 62 |

The only question for decision is whether amounts received pursuant to certain agreements relating to the disposition of fill dirt and other materials should be taxed as ordinary income or as capital gain.

FINDINGS OF FACT

The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference.

Petitioners, Irvin C. Walker and Elsie Walker Barnes, are co-executors "of the estate" of Marian H. Walker, deceased. At the time the petitions in this case were filed, their postal address was 801 Bank of Delaware Building, Wilmington, Del. Marian H. Walker (decedent) filed Federal income tax returns for the calendar years 1963, 1964, and 1965 with the district director of internal revenue at Wilmington, Del. Her returns were prepared on a cash method of accounting. On October 3, 1966, decedent died testate in Wilmington, Del. A Federal income tax return for the calendar year 1966 was filed by Irvin C. Walker and Elsie Walker Barnes, "Executors of the estate of Marian H. Walker," with the district director of internal revenue at Wilmington, Del.

On September 18, 1922, decedent and her husband, John C. Walker, acquired an 80-acre tract of farmland known as Morven Farm. The Walkers had operated the farm since 1903, pursuant to a lease and sharecropping agreement, and from the date they purchased the farm, until September 7, 1961, the date of the death of John C. Walker, the farm was operated exclusively as a produce or truck farm.

An appraisal of the farm was made by John C. Roman as of the date of Mr. Walker's death. Roman's appraisal provided a fair description of the farm and its operations at that time. Pertinent portions of the appraiser's report were as follows:

LOCATION AND SIZE OF PROPERTY

The site under appraisement is located on the easterly side of the Du Pont Highway (Rts. 13 & 40), south of Hares Corner, in New Castle Hundred and County, State of Delaware.

The New Castle County Board of Assessment states that there are some 59.128 acres within the bounds of the farm.[1]

  \*   \*   \*   \*   \*   \*   \*

SITE AND LOCALE

Said specific site is partially a going farm and a commercial complex. Of the 59 plus acres, approximately 15 acres are low and wooded, with the balance available for farming and for commercial use.

A barn and granary, both in need of repairs, were the only farm buildings on the site. The home, which is quite old, is in need of substantial renovations.

---

[1] The evidence does not disclose how or when the size of the farm was reduced from its original size of approximately 80 acres.

As the value of the farm is reflected in the commercial frontage and the high land, the writer has discounted the value of the enumerated buildings.

In general the site locale is a hodge-podge of commercial ventures. Located on the premises is a truck terminal, a display area for two sample homes, a small restaurant, along with a retail outlet that sells crabs. In close proximity one will observe motels, gas stations, restaurants, gift shops and liquor stores.

ZONING

The frontage of approximately 1400 feet, up to a permissible zoning depth of 300 feet, is zoned C-3 which permits for all commercial uses. The interior is zoned R-2 which permits among other things, farming and housing, provided said housing is on a two-acre site.

VALUATION

As stated elsewhere herein the subject farm consists of approximately 59 acres. Of this acreage some 15 acres are low and overgrown with trees and heavy brush, leaving 44 acres for farming and commercial use. As the frontage—1400' x 300'—approximates 9.5 acres, thus 34.5 acres remain for farming or general use. Summarizing, some 15 acres are low; 9.5 acres are zoned for commercial use; and the balance of 34.5 acres have a varied but limited use.

\*     \*     \*     \*     \*     \*     \*

The subject farm is favored with approximately 1400 feet of Du Pont Highway frontage which has a commercial zoning use up to a depth of 300 feet. Approximately 480' of this frontage is not leased because it is from 6' to 20' above road level and it would entail considerable cost to bring it down to road grade level. Then, too, this portion of frontage faces the highway wherein the slope of the road is rather extensive; and apparently that is the reason for its non-use as commercial frontage.

\*     \*     \*     \*     \*     \*     \*

SUMMARY OF VALUES

| | |
|---|---:|
| Low ground—15 acres at $400 | $6,000 |
| High ground—34.5 acres at $2000 | 69,000 |
| Nonusable commercial frontage—480' at $70 | 34,000 |
| Commercial frontage—920' at $125 | 115,000 |
| | 224,000 |

On March 18, 1963, decedent, then 82 years old, entered into an agreement with Greggo & Ferrara, Inc. (identified therein as "Contractor") relating to the removal of fill dirt and other materials from a portion of the farm (sometimes hereinafter referred to as Tract No. 1) and the grading of that tract upon completion. The agreement, which identified decedent as "Owner," provided in part as follows:

WHEREAS, Owner is seized in fee of a certain farm tract situate in New Castle Hundred aforesaid and being bound on the Northwest by Route No. 13 and on the Northeast by property now or formerly of Joseph Quigley, on the Southeast by property of the Pennsylvania Railroad Company and on the Southwest by property now or formerly of George Barthalomew; and

WHEREAS, Owner is desirous of having a portion of said property graded for future commercial or other uses and Contractor has agreed to perform such

grading work, subject, however, to all of the terms, conditions, options and agreements hereinafter contained.

Now THEREFORE, in consideration of the mutual promises, and agreements hereinafter contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Owner and Contractor hereby covenant, stipulate and agree as follows:

1. Owner hereby retains the Contractor to grade the property of the Owner, described in Exhibit "A" hereto, by removing fill dirt and other minerals therefrom, said grading operation, however, is subject to the following terms and conditions:

(a) All material removed by Contractor from the property described in Exhibit "A" hereto shall become the property of the Contractor upon payment to Owner of the sum of Sixteen Cents (16¢) per cubic yard of material removed; said payment to be made on or before the Fifteenth day of each month for material removed for the preceding month, said payments to be made in accordance with the cross sectionings and measurements of the material removed made by or on behalf of Contractor;

(b) Grading and the removal of material shall start at the Southeasterly right-of-way line of Route No. 13 and proceed Southeasterly to the right-of-way line of the Pennsylvania Railroad Company; provided, however that the grading of that portion of said property extending Southeasterly from Route No. 13 to a distance of Four Hundred (400) feet shall be graded to an elevation of One (1) foot above the elevation for the right-of-way of said Route No. 13 and such portion of said grading shall be completed by the Contractor during the 1963 calendar year;

(c) Grading and removal of materials shall proceed in such manner as to cause all normal surface water to drain Northeasterly in and to the drainage ditch located on or near the boundary line between the property shown on Exhibit "A" hereto and the property now or formerly of Joseph Quigley;

(d) The grading and removal of materials shall proceed in such manner so as not to disturb or interfere with the enjoyment by Greater Wilmington Airport Commission of a portion of the property of the Owner heretofore acquired by said Commission for Airport purposes, nor shall such grading and removal of such materials be conducted closer than Two Hundred (200) feet to the old farm house located on the property shown on Exhibit "A" hereto;

(e) Contractor shall obtain all necessary permits that may be required by any public authority for grading and removing materials from the property of the Owner shown on Exhibit "A" hereto;

(f) Contractor shall be responsible and pay for any surveys or engineering work that may be required by the Contractor in performing the grading operations hereunder;

(g) Contractor shall strip the top soil and grade and remove materials from Five (5) acres (approximately) at a time and will restore and spread the top soil at the conclusion of the working of each Five (5) acre area;

(h) Contractor shall have the right at all times to stock pile top soil and other materials upon any portion of the property shown on Exhibit "A" hereto until such time as said top soil is to be restored and/or such material is sold by Contractor for construction or other purposes;

*        *        *        *        *        *        *

3. As a further consideration for this Agreement, Owner grants to Contractor such rights of ingress and egress over the property of Owner as shall be neces-

sary and convenient for the Contractor to proceed with the grading operations contemplated by this Agreement.

4. Also as a further consideration for this Agreement, the Contractor agrees, at Contractor's cost, to amesite the driveway on the property of the Owner on which the recently constructed bungalow is situated as well as the lane leading from Route No. 13 to said driveway at a width of fourteen (14) feet, said improvements to said lane and driveway to be performed by Contractor at such time as weather conditions permit.

5. Also as a further consideration for this Agreement, the Owner grants to Contractor the first right and option to remove fill dirt and other minerals from the remaining property of the Owner (not included in Exhibit "A" hereto) upon the same applicable terms and conditions as set out under numbered paragraphs 1, 2 and 3 hereof, except that Contractor shall pay to Owner in respect of any dirt or other minerals removed from said additional property of the Owner the sum of Eighteen Cents (18¢) per cubic yard for the first million cubic yards removed from such property and the sum of Twenty Cents (20¢) per cubic yard for all fill dirt or other minerals removed from such additional property in excess of said one million cubic yards. In the event Owner shall elect to have removed from her said other property, or any portion thereof, fill dirt or other minerals, she shall notify Contractor in writing of such election and a description of the property from which any such fill or other minerals are to be removed and Contractor shall accept or reject the right to exercise the option in this paragraph granted to Contractor within fifteen (15) days from the receipt by it of such notice. In the event Contractor elects to exercise the option herein granted, it shall notify the Owner in writing within the said period and thereupon this Agreement shall govern the rights, obligations and undertakings of the Owner and the Contractor. In the event Contractor shall elect not to exercise said option, then the same shall become absolutely null and void.

6. This Agreement shall bind and inure to the benefit of the parties hereto and their respective personal representatives, successors, heirs and assigns.

The agreement was drafted by Clair J. Killoran, Esq., who represented both the decedent and Greggo & Ferrara, Inc. (Greggo & Ferrara), in the transaction. The stock of Greggo & Ferrara was owned equally by Eugene Greggo and Nicholas Ferrara. It engaged in road construction, excavation, and "the gravel business." Prior to the execution of its agreement with decedent the firm made only a rough estimate of the volume of dirt and other materials to be removed from Tract No. 1.

The dirt was removed from the farm by truck. As the trucks left the working area, they were weighed at a weighing station on the farm. On the basis of this procedure, the amount of dirt and other materials removed was calculated and recorded. Greggo & Ferrara used some of the materials on its own road-building projects; it sold the remainder to other contractors.

Article XVII, section 6, of the New Castle County Zoning Code specifically prohibited excavation for commercial purposes in an R–2 District unless the site plan was first approved by the Department of Planning:

SECTION 6. EXCAVATION OF CLAY, SAND, GRAVEL, OR ROCK—The excavation of clay, sand, gravel, rock, or other natural mineral deposit for use on the *premises*, for grading of such *premises*, or for the construction of buildings *shall* be permitted in any district; materials thus excavated and not used on the *premises* may be sold.

The excavation of these materials for commercial purposes *shall* be permitted in an R-2, M-2, or M-3 District, but only after submission to and approval by the Department of Planning of a site plan showing the proposed area of operation, the minimum distance between any quarrying operation and existing street and *lot* lines, the proposed manner of operations including the routing of traffic to and from the site, and the proposed restoration or improvement of the site or any part thereof at the conclusion of quarrying operations. * * *

Shortly after the operations began on Tract No. 1, Greggo & Ferrara received a letter dated June 19, 1963, from the county building inspector, representing the Department of Public Works and Services of New Castle County, Del. The letter stated in part:

You are operating a sand pit on Route #13 on the Walker property.

You have not submitted any plans for any type of construction, since you have not submitted any plans, I would say you are a Commercial Business in R-2 which is not permitted.

This should be approved by the Regional Planning Commission, as you are violating Article #15 Sec. 6.

This must be taken care of at once or your job will be stopped.

On June 21, 1963, Clair J. Killoran, Esq., the attorney who had drafted the agreement between decedent and Greggo & Ferrara, replied as follows:

Your letter of June 19 to Greggo and Ferrara relative to its grading operations on Route 13 on the Walker property has been handed to me for attention. We represented the parties in this action, and Mrs. Marian Walker desired her property to be graded to an elevation one foot above Route 13 and Greggo and Ferrara was awarded the job.

It is my understanding under the Code that if you merely are grading your property, the surplus material can be disposed of. If you desire a grading plan to straighten out this matter, we will be glad to provide you one for the area to be graded.

A subsequent letter, dated February 5, 1964, from Killoran to another county building inspector substantially reiterated the position taken in his first letter:

This contract is in writing dated March 18, 1963 and is restricted exclusively to a grading operation which she desires accomplished in order that her property may be made available for her own contemplated uses. Without the property being graded to certain elevations, the drainage was such that it could not be economically developed. This contract is predicated expressly upon the provisions of the first paragraph of Section 6 of Article XVII of the New Castle County Zoning Code. * * *

On October 1, 1963, Greggo & Ferrara assigned its right under its agreement with decedent to Parkway Gravel, Inc. (Parkway), the stock of which was also owned equally by Eugene Greggo and Nicholas Ferrara. Parkway was similarly engaged in the sand and gravel business.

Pursuant to paragraph 4 of the 1963 agreement, Greggo & Ferrara and Parkway "amesited" the driveway and road on decedent's property. The fair market value of these improvements was $1,200. Moreover, by the end of 1965, substantially all of the work on Tract No. 1, including the replacement of the top soil, was completed.

On July 28, 1965, a document entitled "Amendment to Agreement" was executed by Parkway (identified therein as "Contractor") and decedent (identified therein as "Owner"). It recited that "all of the conditions (whether conditions precedent or otherwise), provisions, rights and options" set forth in paragraph 5 of the agreement of March 18, 1963, had been complied with by both parties and that consequently the agreement was "extended" to cover additional property on the farm:

That for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Owner hereby retains the Contractor to grade the additional property of the Owner described in Exhibit "A" hereto by removing fill dirt and other minerals therefrom, such grading operation, however, to be subject to the terms and conditions of said agreement dated March 18, 1963, except as aforesaid, and also expressly subject to and in accordance with the provisions in respect of payment by Contractor to Owner in respect of any dirt or other minerals to be removed from said additional property of the Owner described in Exhibit "A" hereto, all as set forth in paragraph 5 of the agreement dated March 18, 1963 and above set forth.

Contractor agrees to grade said additional property of the Owner as described in Exhibit "A" hereto, all in accordance with this Agreement and in accordance with the provisions of said agreement dated March 18, 1963, and to complete such grading operations within a reasonable time, due allowance to be made for delays occasioned by strikes, weather, equipment shortages, acts of God, lack of demand or market for fill or other minerals to be removed from said additional property of the Owner described in Exhibit "A" hereto, or for other causes beyond the Contractor's reasonable control.

This Agreement shall bind and inure to the benefit of the parties hereto and their respective personal representatives, successors, heirs and assigns.

The property governed by the agreement of July 28, 1965, will hereinafter be referred to as Tract No. 2. Together, Tract Nos. 1 and Tract 2 comprised all but 2.1 acres of decedent's farm. The remaining 2.1 acres, hereinafter referred to as Tract No. 3, separated Tract No. 1 from Tract No. 2 and included the farm's driveway and the land upon which decedent's house and farm buildings were located.

Decedent had four children, and after her death in October of 1966,

the children agreed to have fill dirt and other materials removed from Tract No. 3 so that all three tracts would be on approximately the same level. They subsequently entered into an oral agreement with either Greggo & Ferrara or Parkway to have such dirt removed and the topsoil then returned.

At the time of the trial herein, all of the materials had been removed from Tract No. 1 and the topsoil had been completely returned; on Tract No. 2, approximately 75 percent of the topsoil had been returned; and on Tract No. 3, about 50 percent of the materials expected to be excavated had been removed.

Before entering into the agreements Greggo & Ferrara (or Parkway) had tested the farm property so that when they began digging, they were already familiar with the type of material which lay beneath the topsoil. During their excavations, they discovered that roughly 10 percent of the material was inferior in quality to that which they had expected to find. In an effort to obtain more desirable material, they occasionally excavated below the grade level required by their agreements with decedent, removed better quality material from the lower level, and replaced such material with the inferior substances which they did not want.

Greggo & Ferrara (and Parkway) entered into the agreements with decedent in order to acquire fill dirt and other materials for use on their own road-building contracts and for sale to other contractors. On the other hand, decedent was interested both in selling the materials and in having the property left in such condition that its grade and its drainage facilitated the productive use of the land in the future. At the time of the trial herein no plan to use the farm property for commercial purposes had been submitted to a planning or zoning commission.

An appraisal of the farm was made as of October 3, 1966 (the date of decedent's death), and December 11, 1967. The appraisal was conducted by John C. Roman, who had previously made the appraisal as of the date of Mr. Walker's death. His report stated in part:

Site and Locale

What was once a small operating farm is today a hodge podge commercial venture. A portion of the frontage is utilized for income purposes. Hereon are located a truck repair shop, restaurant and a gun shop.

The bulk of the land is being mined for the removal of sand and gravel. This has resulted in many pits and obviously adversely affects the value of the land currently and after it has been depleted of sand and gravel.

The general site locale is one that plies on the tourist trade. Herein are located motels, restaurants, gasoline stations, liquor stores and a bus terminal. In general the immediate site area is one of declining values because of the age of the facilities offered to the traveling public.

\*     \*     \*     \*     \*     \*     \*

Summary of Values

| | |
|---|---:|
| Low ground—15 acres at $400 | $6,000.00 |
| High ground—30.29 acres at $1600 (after depletion of sand and gravel) | 48,464.00 |
| Frontage—not leased (495 feet at $125) | 61,875.00 |
| Frontage—leased for $6600 yearly (500 feet—capitalized at 8%) | 83,250.00 |
| Sand and gravel removed (10/4/66 to 12/12/67) (327,089.14 cubic yards at .18 per yard | 58,876.02 |
| | 258,465.02 |

As stated heretofore, approximately 1,000,000 cubic yards of sand and gravel, priced at .18 per yard, are to be removed within an approximate period of four (4) years. This potential asset of some $180,000. has been discounted by using the Reversionary Tables with the following factors: .045 interest; 4 year removal period; with a discount factor of .8386.

| | |
|---|---:|
| In effect this asset has a current value of: | 150,948.00 |
| Total value | 409,413.02 |
| Say—rounded out | 409,425.00 |

The following amounts of fill dirt and other materials were removed from decedent's farm by Greggo & Ferrara and Parkway under the 1963 and 1965 agreements:

| Year | Cubic yards removed | Tract No. |
|---|---:|---:|
| 1963 | 113,962.70 | 1 |
| 1964 | 193,792.91 | 1 |
| 1965 | 299,729.06 | 1 |
| 1/1/66–10/3/66 [2] | 279,633.07 | 2 |
| 10/3/66–12/31/66 | 72,408.90 | 2 |

Decedent (or her estate) received the following sums in return for the materials removed:

| Year | Amount |
|---|---:|
| 1963 | $17,411.55 |
| 1964 | 29,051.99 |
| 1965 | 47,956.66 |
| 1/1/66—10/3/66 | 51,438.42 |
| 10/3/66—12/31/66 | 14,605.73 |

In her Federal income tax returns for taxable years 1963, 1964, and 1965, decedent reported as long-term capital gain the following amounts received pursuant to her agreements with Greggo & Ferrara and Parkway:

| Year | Item | Gross sales price | Gain |
|---|---|---:|---:|
| 1963 | "Surplus Material" | $18,234.05 | $18,234.05 |
| 1964 | "Surplus Material" | 29,051.99 | 29,051.99 |
| 1965 | "Surplus Material" | 47,956.66 | 47,956.66 |

---

2 The stipulation reads "10-31-66," obviously a typographical error for "10-3-66."

In the Federal income tax return for 1966, the executors reported the following amount as long-term capital gain:

| Item | Gross sales price | Gain |
|---|---|---|
| Sale of gravel, sand, fill dirt in place pursuant to grading contract dated Mar. 18, 1963 | $66, 044. 45 | $66, 044. 45 |

In his statutory notices of deficiency, the Commissioner determined that proceeds received from Greggo & Ferrara and Parkway under the agreements of March 18, 1963, and July 28, 1965, constituted ordinary income as follows:

| | Cash | Fair market value of improvements | Total |
|---|---|---|---|
| 1963 | $17, 411. 55 | $1, 200 | $18, 611. 55 |
| 1964 | 28, 051. 99 | | 28, 051. 99 |
| 1965 | [3] 47, 456. 66 | | [3] 47, 456. 66 |
| 1/1/66—10/3/66 | 51, 438. 72 | | 51, 438. 72 |
| 10/3/66—12/31/66 | 14, 605. 73 | | 14, 605. 73 |

He also determined that decedent was entitled to a 5-percent depletion allowance in respect of the materials removed from her property pursuant to the two agreements.

OPINION

RAUM, *Judge:* The only question before us is whether the amounts received by decedent (or her estate) in connection with the excavation and grading operations on her property are taxable as capital gain or as ordinary income. The issue is a familiar one, and the general principles governing its resolution have been established by the decided cases. Where a transfer of mineral rights has been regarded as amounting to a sale of minerals "in place," the gain reflected in payments made in return therefor has been taxed at capital gain rates. See, e.g., *Barker* v. *Commissioner*, 250 F. 2d 195, 197 (C.A. 2), reversing 24 T.C. 1160; *Gowans* v. *Commissioner*, 246 F. 2d 448 (C.A. 9), reversing a Memorandum Opinion of this Court; *Crowell Land & Mineral Corp.* v. *Commissioner*, 242 F. 2d 864 (C.A. 5), reversing 25 T.C. 223; *Robert M. Dann*, 30 T.C. 499, 505. On the other hand, where the transferor has retained an "economic interest" in the minerals being disposed of, the payments made to him have been treated as ordinary income. See, e.g., *Dingman* v. *United States*, 429 F. 2d 70 (C.A. 8); *Rutledge* v. *United States*, 428 F. 2d 347 (C.A. 5); *Laudenslager* v. *Commissioner*, 305 F. 2d 686 (C.A. 3), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 947; *Samuel L. Green*, 35 T.C. 1065.

A property owner has retained an "economic interest" in a mineral deposit if (1) he has acquired by investment an interest in the min-

---

[3] The discrepancy between the $47,456.66 amount determined by the Commissioner and the $47,956.66 which the parties have stipulated as the amount actually received in 1965 is unexplained.

erals in place and (2) then looks to the extraction of the minerals for a return of his capital. See *Palmer* v. *Bender*, 287 U.S. 551, 557; *Commissioner* v. *Southwest Explor. Co.*, 350 U.S. 308, 314; *Laudenslager* v. *Commissioner*, 305 F. 2d at 690 (C.A. 3); *Rutledge* v. *United States*, 428 F. 2d at 350 (C.A. 5). The second part of this test is at the center of the controversy here. Petitioners argue that decedent disposed of her entire interest in the materials to be excavated when she entered into her agreements with Greggo & Ferrara and Parkway. The Commissioner, on the other hand, insists that decedent retained an economic interest in the materials. In considering a quite similar issue, the Fifth Circuit stated in *Rutledge* v. *United States*, 428 F. 2d 347, 351:

> Taxpayer claims to have divested himself of his economic interest in the minerals in place in the two tracts by means of a capital sale and seeks to treat the proceeds as capital gain. We must ask whether he looks to extraction or the mineral for his return. If he looks solely to extraction for his return, we cannot say that he has divested himself of his economic interest in the minerals in place. If he has retained an economic interest, he is not entitled to treat his return as capital gain. * * *

Cf. *Standard Oil Co. (Ind.)*, 54 T.C. 1099, 1113–1119.

We think it evident that under her contracts with Greggo & Ferrara and Parkway, decedent did not divest herself of her economic interest in the materials to be excavated. The first agreement provided that the materials would not become the property of Greggo & Ferrara ("Contractor") until they had been removed and until decedent had been paid for them at the rate of $0.16 per cubic yard:

> All material removed by Contractor * * * shall become the property of the Contractor upon payment to Owner of the sum of Sixteen Cents (16¢) per cubic yard of material removed * * *

As a result, decedent looked to the excavation of materials as the basis for her payments.[4] And the materials did not become the property of Greggo & Ferrara until they had been removed and payment had been made. What we stated in *Samuel L. Green*, 35 T.C. 1065, 1070–1071, is thus applicable here:

> The master contracts * * * merely established the terms and conditions upon which petitioners undertook to sell dirt as the contractors removed it from petitioners' land. The contracts themselves did not effect any such sale. Until the dirt was removed from the property it belonged to petitioners, and the payments received by petitioners were based upon the amount of soil extracted from the land. A moment's reflection will disclose the unsoundness of the position that the

---

[4] Greggo & Ferrara also agreed to amesite decedent's road and driveway. However, in view of the fact that the fair market value of the improvements amounted to only $1,200, as compared with the some $160,000 received on the basis of the volume of materials excavated, we think that the cash payments were the essence of the consideration and that the improvements were of comparatively minor significance.

contracts themselves constituted a sale of the soil in place. Had either of the contractors gone into bankruptcy prior to removal of all the soil permitted under the contracts, could there be any doubt that the remaining soil would not have been an asset of the bankrupt? Plainly, the contracts in this case did not result in petitioners' parting with all interest in the soil prior to removal. They continued to own that soil until it was bought by the contractors, truckload by truckload, in accordance with the master contracts. * * *

Petitioners have emphasized that decedent's predominant purpose was to have her property graded, rather than simply to dispose of the materials on it, and that the contracts *required* both the removal of specified materials and the subsequent grading of the property. We doubt the relevance of decedent's purpose to the issue before us. See *Samuel L. Green*, 35 T.C. 1065, 1071. In any event, bearing in mind the petitioners' burden of proof, we think that the record does not support their view of the facts of this case. Decedent had two purposes, to sell the materials excavated from her property and to have the land left in a condition suitable for its future use. The record does not convince us that one purpose predominated over the other. Furthermore, although the parties' first contract referred to decedent's desire to have her property graded, it did not *require* the removal of material, beyond a provision calling for the completion of a certain portion of the grading by the end of 1963. The agreement specified only the manner in which the materials were to be removed and the property graded. Thus the contract provision requiring the contractor to proceed "five acres at a time" helped to ensure that in those areas where materials were removed, the property would be left in a suitably graded condition.

Under the second agreement, Parkway did agree to complete grading operations on Tract No. 2 "within a reasonable time." However, this provision must be read in the light of the qualification that "due allowance" was made for delays occasioned by "lack of demand or market for fill or other minerals to be removed." That qualification may be highly significant. Cf. *Laudenslager* v. *Commissioner*, 305 F. 2d at 691–692 (C.A. 3). In any event, regardless of the extent of Parkway's obligation to remove materials from Tract No. 2, decedent nevertheless continued to look to the excavation of those materials as the basis for its payments under the contract. Decedent's reliance on such mineral production is, in the circumstances of this case, of overriding significance in determining whether she retained on economic interest in the materials on her property.

Petitioners have cited a number of cases which they consider to support their position. We think that all of them are factually distinguishable from the present case. We emphasize that here there was no disposition of materials "in place" and that apart from the improve-

ments made on decedent's property, which were of a fair market value of only $1,200, decedent looked solely to the excavation of materials for her return, which amounted to a total of more than $160,000 between 1963 and the end of 1966. Compare *Robert M. Dann,* 30 T.C. 499, 505, and *Gowans* v. *Commissioner,* 246 F. 2d at 451–452 (C.A. 9). Petitioners have also relied on *Crowell Land & Mineral Corp.* v. *Commissioner,* 242 F. 2d 864 (C.A. 5), and *Dingman* v. *United States,* 303 F. Supp. 110 (D. Minn.). However, *Crowell* must be read in the light of the Fifth Circuit's more recent decision in *Rutledge* v. *United States,* 428 F. 2d 347, which limited the scope of that case. Cf. *Laudenslager* v. *Commissioner,* 305 F. 2d at 692 fn. 4 (C.A. 3). And *Dingman,* which was characterized in petitioners' brief as "practically identical" with the case at bar, has been reversed by the Court of Appeals for the Eighth Circuit. 429 F. 2d 70.

*Decisions will be entered for the respondent.*