F. & G. SAND AND GRAVEL CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
F. & G. Sand & Gravel Co. v. Commissioner
Docket No. 484-75.
United States Tax Court
T.C. Memo 1976-360; 1976 Tax Ct. Memo LEXIS 44; 35 T.C.M. (CCH) 1632; T.C.M. (RIA) 760360; November 29, 1976, Filed Leslie B. DiCicco, for the petitioner. Daniel P. Ehrenreich, for the respondent. RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioner's Federal corporate income tax as follows: Fiscal Year ending June 30
Deficiency
1971
$ 803.63
1972
6,625.95
1973
7,762.87
Petitioner has conceded the 1971 deficiency. As to the other two years the only matter in controversy relates to a contractual arrangement between petitioner and the City of Worcester pursuant to which petitioner removed from specified City-owned land 650,000 cubic yards of gravel in respect of which *45 it made payments to the City aggregating $130,000. The parties have stipulated that petitioner "deducted" these payments in its fiscal years 1972 and 1973 as "cost of goods sold", and the only question now in issue is whether it is entitled, in addition, to claim further recovery of its investment through deductions for percentage depletion under sections 611 and 613, I.R.C. 1954. [1] The facts have been stipulated. Petitioner, F. & G. Sand and Gravel Co., Inc., is a Massachusetts corporation which was located in Shrewsbury, Massachusetts, at the time the petition herein was filed. It filed its corporate Federal income tax returns for its fiscal years ended June 30, 1971, June 30, 1972, and June 30, 1973, with the District Director, Andover Service Center, Andover, Massachusetts. On March 3, 1971, petitioner, as "Contractor", *46 entered into a contract with the City of Worcester, Massachusetts, entitled "Contract for the Sale and Removal of Gravel". This contract provided, in part, as follows: WITNESSETH, that the Contractor and the City for good and valuable consideration, agree as follows: (a) The contractor shall remove gravel and other earth materials, excepting ledge and loam, in the amount of 650,000 cubic yards from the area assigned to it as shown on the plan attached hereto. The total volume of gravel and other earth materials to be removed has been determined to be 1,300,000 cubic yards. (b) The final grading of each excavated area shall be to a uniform grade in accordance with the attached plan.
(c) The contractor will be required to grade its work area concurrently with the removal of gravel to its possession. Under no circumstances will the contractor be allowed to remove all the gravel specified for its own possession from any portion of its work area to greater depths than specified by the finish grades. (d) The contractor shall pay to the City of Worcester the sum of $130,000.00 over a period of 24 months at the rate of $5,416.66 per month for the first 23 months and $5,416.82 *47 for the 24th month. Each payment shall be made within the first 15 days of the month in advance of actual removal of earth formation. (e) At no cost to the City of Worcester, the gravel contractor shall do the subsidiary obligations of maintaining the work area free from rubbish and material that cannot be salvaged, remove trees, bushes, miscellaneous debris, and strip and stack loam cover at the work area. Certain trees may be designated to remain for the future site development of the work areas and these trees are to be preserved and protected from damage by the gravel contractor during the period of its operations at the site of the work. The work areas shall be stripped of all top soil (loam) to whatever depth the present top soil may occur. The top soil is to be stock piled at convenient locations on the site as directed by the Commissi ner of Public Works. The top soil is to remain at the site and shall not be included in the earth materials to be excavated and possessed by the gravel contractor. (f) When the top soil has been removed, the subsoil shall be removed from the excavation shall be removed completely from the work areas. Normally, it is expected that *48 the subsoil will be gravel and other earth material suitable for construction purposes off the site of the work areas, and for the removal of this material each * gravel contractor shall pay the specific price ($130,000.00) to the City of Worcester. (g) The contractor and the City of Worcester shall mutually agree that the cross-section, average and area type of volume measurement shall be the method that shall govern the volume of earth excavation removed under the agreement. The work areas have been surveyed by photogrammetric methods to determine the existing configuration of the earth's surface. Before the excavation work is actually started, the Bureau of Engineering will stake out a horizontal grid system with existing and finished grades for the work area involved. The gravel contractors are free to make their own measurements to be assured that the volume of material between existing grades and finished grades is truly and honestly represented. (h) No plan equipment such as screens, washers, or any other types of processing *49 equipment are to be used at the site of the work. Types of authorized equipment are power shovels, backhoes, cranes, bulldozers, scrapers, gradalls, trucks, and similar types of earth moving equipment. (i) The gravel and other earth materials to be removed from the work areas shall be removed within two calendar years after the execution of the agreement to do this work. (j) Certain portions of the work areas may be desired by the City sooner than other portions to satisfy an impending sale of land and development. The City reserves the right to require these portions to be ready sooner than other portions of the work areas. Once a portion has been brought to the proper finish grade, the City reserves the right to sell the portion, with the stipulation that such portion is not occupied and used in such a manner as to interfere with subsequent gravel removal operations. (k) Workarea A on the attached plan will be assigned to F & G Sand & Gravel Co., Inc. and Work Area B will be assigned to Worcester Sand and Gravel Co., Inc. Each gravel contractor will excavate his area on either side of the buffer strip running north and south between grid lines 10-50 and 11+50. Upon *50 completion of the sloping of embankments of the buffer strip, F & G Sand and Gravel Co., Inc. will remove and possess the gravel located in the buffer strip, in order to obtain its full volume of 650,000 cubic yards, as required by its agreement with the City. (1) The Contractor shall obtain and deposit with the City bonds as follows: Performance Bond: ONE HUNDRED THIRTY THOUSAND DOLLARS ($130,000.00) Payment Bond: ONE HUNDRED THIRTY THOUSAND DOLLARS ($130,000.00) with sureties satisfactory to the City (a) guarantee the faithful performance by the Contractor of all its obligations under this contract and (b) constitute security for the payment by the Contractor and its subcontractors for all labor performed or furnished and for all materials used or employed in connection with this contract. * * *
(n) The work shall be carried out under the direction and subject to the approval and acceptance of Vincent M. Hynes, Commissioner of Public Works, (hereinafter called the Contracting Officer). Appended to the contract were several riders which provided, in part, as follows: FAILURE OF PERFORMANCE (a) If the contractor shall be adjudged a bankrupt, or if he shall make *51 a general assignment for the benefit of his creditors, or if a receiver of his property shall be appointed, or if the work to be done under the contract shall be abandoned, or if the contract or any part thereof shall be sublet without the previous written consent of the Contracting Officer, or if the contract or any claim thereunder shall be assigned by the Contractor otherwise than as herein specified, or if at any time the Contracting Officer shall be of the opinion that the work, or any part thereof, is unnecessarily or unreasonably delayed, or that the Contractor has violated any of the provisions of the contract, the Contracting Officer, for and in behalf of the City, may notify the Contractor to discontinue all work, or any part thereof; and thereupon the Contractor shall discontinue such work or such part thereof as the Contracting Officer may designate, remove his equipment, tools, supplies and materials as the Contracting Officer directs, and the City may thereupon, by contract or otherwise, as it may determine complete the work or such part thereof, and charge the entire expense of so completing the work or any part thereof to the Contractor. (b) If the Contracting Officer *52 shall certify by written notice to the Contractor that the rate of progress is not satisfactory, the City may, instead of notifying the Contractor to discontinue all of the work or any part thereof, notify him from time to time to increase the force, equipment and plant, or any of them, employed on the whole or any part of the work, stating the amount of increase required.Unless the Contractor shall, within five days after such notice, increase his force, equipment and plant to the extent required therein, and maintain and employ the same from day to day until the completion of the work or such part thereof or until the conditions as to the rate of progress shall, in the opinion of the Contracting Officer, be fulfilled, the City may employ and direct the labors of such additional force, equipment and plant as may, in the opinion of the Contracting Officer, be necessary to insure the completion of the work or such part thereof within the time specified or at the earliest possible date thereafter, and charge the expense thereof to the Contractor. Neither the notice from the Contracting Officer to the Contractor to increase his force, equipment or plant nor the employment of additional *53 force, equipment or plant by the City shall be held to prevent a subsequent notice to the Contractor from the City to discontinue the work under the provisions of the preceding portion of this article. Petitioner made the payments to the City of Worcester called for under the contract during the fiscal years ended June 30, 1972, and June 30, 1973, and deducted these payments on its Federal income tax returns for those two fiscal years as cost of goods sold. Petitioner also claimed a percentage depletion deduction of five percent on its Federal income tax returns for each of those two fiscal years, calculating its depletion deduction on the basis of its gross income from the sale of sand and gravel obtained pursuant to the contract, less the amounts paid to the City of Worcester. [2] The Commissioner did not challenge the former deductions, but disallowed petitioner's claimed deductions for percentage depletion in their entirety in each of the two fiscal years in issue. In supporting his position, the Commissioner contends primarily that petitioner acquired an interest in the 650,000 cubic yards of gravel at a cost of $130,000, that it was entitled to recover that investment upon *54 sale of the gravel (whether such recovery be described as "cost of goods sold" or "cost depletion"), but that it was not entitled to recover its investment a second time through the medium of percentage depletion. We hold that the Commissioner must prevail. The general factual situation which gives rise to cases like the one before us is a familiar one. The owner of land enters into a contractual arrangement with someone (the "contractor") who is to extract from the property certain natural resources (e.g., sand, gravel, petroleum, minerals, etc.), and keep them for himself or otherwise dispose of them for his own account. The contractor is required to make payment to the landowner in respect of such natural resources. Although the taxpayer in the present case is the contractor, nearly all of the decided cases in the sand and gravel field involve the tax liability of the landowner, *55 and it is to these cases and the theories upon which they rest that we must look for guidance here. The landowners in these cases have generally attempted to treat the amounts received as the proceeds of sale of capital assets (i.e., the extracted natural resources) so that any gain realized might be taxed at the more favorable capital gains rates. The Government, on the other hand, has sought to tax such receipts as ordinary income. And the rule that has evolved in these cases may fairly be stated as follows: Where the landowner has sold the natural deposits "in place" at the outset to the contractor, the transaction may be regarded as the sale of a capital asset; [3] on the other hand, if the sale or sales occur only as the materials are extracted from time to time, the owner is treated as having realized ordinary income from the exploitation of his property (regardless of whether the amounts paid by the contractor be considered as royalties, rents, etc.). [4] Moreover, the result turns upon the substance of the transactions, and not upon the labels that the parties may have placed upon them. [5]
*56 The deduction for depletion permitted by sections 611, 612 and 613 of the Internal Revenue Code was intended to allow the owners of rights in natural deposits of minerals to recoup their capital investments as such minerals are extracted and sold. Palmer v. Bender,287 U.S. 551. Accordingly, where the owner of the property may be regarded as having retained an economic interest in the natural deposits until their severance (as opposed to having sold such deposits "in place" at the time of execution of the contract of sale), the amounts received by the landowner upon extraction are treated as ordinary income (royalties, rents, etc.) derived from the exploitation of his property, subject to a depletion deduction in respect of the diminution of his economic interest in the property that is thus being exploited. See Estate of Walker v. Commissioner,464 F. 2d 75, 77 (C.A. 3), affirming 55 T.C. 522. [6] On the other hand where there has been a sale of the natural deposits "in place", the situation is one that may be treated as the sale of a capital asset, with the consequence that the purchaser is then treated as having the entire *57 economic interest in the natural resources involved and is accordingly entitled to a depletion deduction in respect of the diminution of that economic interest. Cf. Sunray Oil Co. v. Commissioner,147 F. 2d 962 (C.A. 10), certiorari denied 325 U.S. 861, affirming 3 T.C. 251; Quintana Petroleum Co. v. Commissioner,143 F. 2d 588 (C.A. 5), affirming 44 B.T.A. 624. With these principles in mind, we address the question whether there has been a sale here of the 650,000 cubic yards of gravel "in place" upon the execution of the contract. If there was such a sale then petitioner (the contractor) acquired the entire economic interest in that gravel, and petitioner is entitled to the entire depletion deduction allowed by the statute. [7]
*58 There is an overabundance of decided cases in this field (see Samuel L. Green, 35 T.C. 1065, 1069; Pleasanton Gravel Co.,64 T.C. 510, 520, 521), and the results are sometimes not easy to reconcile particularly where a case may be close to the line. Estate of Walker v. Commissioner,464 F. 2d 75, 77 (C.A. 3); Wayman A. Collins,56 T.C. 1074, 1076. Nevertheless, the determinative considerations are clear. Was there in substance and in fact a sale of the natural deposits in place for a fixed, ascertainable consideration, or did the transaction in reality represent nothing more than an agreement for the exploitation of the landowner's property under a royalty or lease arrangement? Although the record before us contains elements that might be urged in support of either result here, it is our judgment that the weight of the evidence calls for a finding that there was a sale of the gravel "in place". We need not embark upon a detailed analysis of the contract. Suffice it to say, we find that the following considerations, among others, strongly support the conclusion that there was a sale of the gravel in place: *59 (a) there was a fixed amount to be taken, i.e., 650,000 cubic yards; (b) the area from which the gravel was to be taken was carefully designated; (c) payment was fixed at $130,000, to be made in monthly installments, without any precise correlation with the number of yards of gravel removed or to be removed during any given month.In our view this case is even stronger than Wayman A. Collins,56 T.C. 1074. See also Rhodes v. United States,464 F. 2d 1307 (C.A. 5). The result of our conclusion that there was a sale of gravel "in place" is that petitioner acquired an economic interest in that gravel and thereupon became entitled to a depletion deduction in respect thereof as the gravel was removed and sold by it. Further, the statutory allowance for depletion in any taxable year is the larger of cost depletion and percentage depletion (which in the case of gravel would be five percent of petitioner's sales price). Sections 611, 612, 613, I.R.C. 1954. But petitioner in substance has already had the benefit of cost depletion by including the amounts paid to the City in its cost of goods sold. The tax benefit which it received by including the *60 amounts in cost of goods sold was greater in this case than would accrue to it under the alternative deduction for percentage depletion. In the circumstances, it is entitled to no further depletion deduction. It has already recovered its investment in a manner equivalent to cost depletion and no further recovery of that investment is permissible under the statute. In view of our conclusion set forth above, we do not find it necessary to reach the Government's alternative position that even if petitioner be held not to have made a purchase of the gravel "in place", it is in any event not entitled to the depletion allowance sought here because it has not shown that it made any investment to acquire an economic interest in the gravel that could be subject to a depletion allowance. Decision will be entered for the respondent. Footnotes
1. In the event that petitioner is entitled to take percentage depletion deductions under sections 611 and 613↩ for the years in question, petitioner concedes that the percentage depletion deductions as claimed on its returns for the fiscal years ended June 30, 1972, and June 30, 1973, are overstated in the amounts of $2,357.92 and $1,931.86, respectively.
*. It appears that there was a companion contract between the City and another contractor in respect of other, but related, gravel deposits.↩
2. Petitioner claimed deductions for percentage depletion of $13,804.20 for the fiscal year ended June 30, 1972, and $16,172,66 for the fiscal year ended June 30, 1973. It has conceded that its deductions were overstated in the amounts of $2,357.92 and $1,931.86, respectively. See note 1, supra↩.
3. Rhodes v. United States,464 F. 2d 1307 (C.A. 5); Wayman A. Collins, 56 T.C. 1074. Cf. Linehan v. Commissioner,297 F. 2d 298↩ (C.A. 1). 4. Estate of Walker v. Commissioner,464 F. 2d 75 (C.A. 3), affirming 55 T.C. 522; Richard L. Ellis,56 T.C. 1079; Samuel L. Green,35 T.C. 1065↩, and cases cited therein. 5. E.g., Rutledge v. United States,428 F. 2d 347 (C.A. 5); Royalton Stone Corp. v. Commissioner,379 F. 2d 298, 299 (C.A. 2); Ollie G. Rose,56 T.C. 185↩.
6. If the contractor has made a capital investment pursuant to his contract with the landowner, he will be entitled to a depletion deduction in respect of the diminution of his economic interest. Compare Helvering v. Twin BellOil Syndicate,293 U.S. 312, with Helvering v. Bankline Oil Co.,303 U.S. 362↩.
7. It is of course a matter of no consequence whether the City of Worcester may or may not be exempt from Federal taxation for reasons unrelated to the issue before us. The point is that petitioner's economic interest in the gravel is measured by the contract and the identity and possibility of tax exempt status of the landowner is irrelevant.↩