**Earl VEST and Fay Vest, Petitioners-Appellees-Cross Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant-Cross Appellee.**

**No. 72-2283.**

United States Court of Appeals, Fifth Circuit.

June 22, 1973.

Rehearing and Rehearing En Banc Denied Aug. 8, 1973.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., Lee H. Henkel, Jr., Acting Chief Counsel, William Brackett, Internal Revenue Service, Washington, D. C., Stephen Schwarz, Atty., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellant-cross-appellee.

William Monroe Kerr, William L. Kerr, Midland, Tex., for petitioners-appellees-cross-appellants.

Before GEWIN, SIMPSON and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

This appeal is from a decision of the Tax Court holding (1) that the grant of underground water rights by taxpayers, Earl and Fay Vest, was a sale and the proceeds were entitled to capital gains treatment and (2) that payments received by the Vests for the grant of various surface rights incident to a mineral lease were in the nature of rent and hence were taxable as ordinary income. The Commissioner appeals from the Tax Court's characterization of the proceeds from the water rights grant and the taxpayers cross-appeal from the ruling on the surface rights payments. We reverse in part and affirm in part.

### I. Water Rights

The Vests owned certain acreage in Winkler County, Texas including the water and mineral rights incident to that

property. Prior to April 1963, Shell Oil Company approached them with a proposal to purchase their water rights together with a right of way to facilitate their development. Shell's chief reason for seeking this agreement was to obtain sufficient reserves to provide water for use in the secondary recovery of oil by means of waterflooding.[1]

On April 29, 1963 a final contract was executed. The Vests transferred to Shell by warranty deed the rights to all water between the depths of 3,000 and 6,500 feet beneath certain described land in Winkler County, Texas save that quantity of water needed by the Vests for their own exploration and production of minerals. Also transferred to Shell was a right of way over the Vests' land for the purpose of developing the acquired water rights and the construction, operation and maintenance of a trunk pipeline to be used to transport and distribute the water.[2]

Shell, in turn, agreed to make payments in monthly installments extending over a 75 year period although it was not required to pay any fixed amount.

See Earl Vest, 57 T.C. 128 (1971). These payments, when they became due, were computed according to Shell's receipts from the sale of "purchase price water."[3] Purchase price water was defined as water produced from the water rights transferred to Shell or from other water rights acquired by Shell from others in Winkler, Ward and Ector Counties, Texas, during April 1963, or from other specified areas of Winkler County that might be brought under the agreement at a later time, or any water, not otherwise covered by the agreement, transported through pipelines constructed pursuant to the agreement. Shell had the option of being relieved of any further liability under the agreement if the quantity of "purchase price water" fell below an average of 50,000 barrels per day for six months. In that event, Shell could transfer the acquired water rights back to the Vests and be relieved of any further obligation. However, even if this option were exercised, Shell still retained the right to utilize any pipeline which might have been laid on the Vests property, upon payment of an additional consideration, for the purpose

1. This is disclosed at the outset of the Sales Agreement between the Vests and Shell: "Shell is purchasing these water rights primarily to obtain sufficient reserves to develop to provide water economically to be used in the secondary recovery of oil by means of water floods in various counties in and about Winkler, Ector and Ward Counties, Texas, and such other endeavors as may from time to time require substantial quantities of water." Waterflooding is a method of recovering oil by means of injecting water into the oil reservoir. See Day v. Commissioner, 54 T.C. 1417, 1420 (1970).

2. Paragraph 2(A) of the Sales Agreement indicates plainly that the transfer of the right of way was not a separate and distinct transaction:

Incidental to the grant of water rights contained in CONCURRENT CONVEYANCE Shell shall have the right of ingress and egress at all times for the purpose of exploring, prospecting, drilling for, and producing the water

found in the rights thereby conveyed and removing the same to other lands, together with the right to construct, maintain and operate processing, purifying, demineralizing, and pumping plants, and fuel, power, telephone and gathering lines to and from them for handling and removing water from other lands within eight (8) miles of the affected plant as well as from the lands covered hereby, said rights as to fuel, power and gathering lines to apply not only to the lands covered by CONCURRENT CONVEYANCE but also to the lands expressly excepted therefrom by provision therein
. . .

3. Each monthly installment was to equal 13⅛ percent of 3 percent of what Shell received for purchase price water during the month until 1.4 billion barrels of water were covered by the agreement then the amount due would rise to 13⅛ percent of 6 percent of purchase price water.

of transporting substances other than water.[4]

From the date of the execution of the agreement through the tax years now in dispute (1965–1967), Shell did not drill any water wells, remove any water directly from the Vests' land or lay any pipeline. Nevertheless, Shell did pay the Vests a total of $26,630.95 for water extracted and transported from the property of neighboring landowners.[5] The Vests reported this income as capital gain received from the sale of the water rights and the right of way. Rejecting this determination, the Commissioner found that the Vests' transaction with Shell was a lease giving rise to ordinary income. Deficiencies were assessed accordingly.

The Tax Court, reversing the Commissioner's determination, held that the income received by the Vests with respect to the water rights and the right of way was capital gain, not ordinary income.[6] Applying the economic interest test approved by this court in Wood v. United States, 377 F.2d 300, 303–304 (1967) it rejected the Commissioner's assertions that the payments were based on production and that the Vests possessed a reversionary interest in the property.[7] Although the Tax Court acknowledged the relevance of such factors as the Vests' reservation of water rights for mineral exploration and the absence of either a fixed sales price or a substantial down payment, it did not regard them as controlling.[8] On the contrary, it found that the agreement between the Vests and Shell constituted a sale of the water in place and a permanent interest in the property for a right of way.[9] The Commissioner appeals from this part of the Tax Court's ruling.

4. It should be noted that an additional consideration of $10 per rod of pipeline would be paid when this contingency occurred.

5. The amounts received by the Vests from Shell were reported as follows:

| Year | Amount |
| --- | --- |
| 1965 | $ 4,545.80 |
| 1966 | 11,278.64 |
| 1967 | 10,806.51 |

6. Earl Vest, 57 T.C. 128 (1971). With respect to the Vest-Shell transaction the taxpayers urgently contend that the Tax Court correctly grasped and resolved the issues involved, although in argument it appears that the taxpayers tend to repudiate some of the descriptive terms used by the Tax Court. In reaching its decision the Tax Court specifically alluded to four separate factors and concluded that no one of them or a combination of all of them was sufficient to support the government's contention that the transaction resulted in a lease rather than a sale. The four factors mentioned and the conclusions reached are as follows:

1. There was a limitation on the grant to the extent that the petitioners *reserved* the right to a portion of the water. It was concluded that, "This small reservation makes the grant of the water no less complete."

2. There was no *down payment* but the court decided "there is no general requirement under the Code that there be a

sizable or any down payment for a transaction to qualify as a sale. . . . Here, an economic interest in the natural deposit was not retained; the absence of a down payment is without major significance."

3. As to the *reversionary* interest of the taxpayers it was decided "Since the petitioners have not retained an economic interest in the water in place, the presence of *a reverter clause* such as this is not inimical to a conclusion that petitioners effected a sale rather than a lease of the water underlying their land." (emphasis supplied)

4. As to whether the taxpayers sold Shell an easement or only leased a right-of-way without *fixed payments* it was concluded: "We note, however, that although the amount of each monthly payment was not fixed, the duty to make payments is to terminate on a specified date after which Shell will continue in possession of the easement. Thus Shell was acquiring a permanent interest in the property for the payments made. In any event the transfer of the easement was an indivisible part of the agreement with Shell, and this Court will not split it off to produce an artificial result for the taxation of the proceeds received under the agreement." (citation omitted).

7. Id. at 150.

8. Id.

9. Id. at 151.

Before reaching the merits of this question, there is a threshold issue which we must discuss briefly. The Commissioner contends that the economic interest test, Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Commissioner v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347, 354 (1956), does not govern the tax consequences of the Vests' transfer of the water rights and the right of way. It is argued that this test was originally conceived to determine who has the depletable interest in minerals with respect to which the percentage depletion allowance is available. As such, the test is said to be a term of art ill-adapted to application outside the depletion context. The Commissioner cites several cases for this position, Bryant v. Commissioner, 399 F.2d 800, 806 (5th Cir. 1968); Moberg v. Commissioner, 365 F.2d 337, 340 (5th Cir. 1966) (Brown, J. concurring), but otherwise gives no concrete economic or scientific reasons to support it.

■ The view in this circuit is firmly established that the economic interest test can be applied to cases outside the percentage depletion area. "Although the 'economic interest' concept was developed and refined primarily in cases dealing with oil and gas law, we have observed that there is 'no apparent justification for a difference in approach depending on the nature of the mineral involved' . . . ." Rutledge v. United States, 428 F.2d 347, 350 (5th Cir. 1970). See also Rhodes v. United States, 464 F.2d 1307, 1310 (5th Cir. 1972); Wood v. United States, 377 F.2d 300, 304 (5th Cir. 1967). In the same vein, it has also been recognized on sev-

eral occasions that regardless of the original purpose of the economic interest test, it is substantially the same as the test employed to determine whether income is taxable as capital gain or ordinary income. Rutledge v. United States, 428 F.2d 347, 351 (5th Cir. 1970); Wood v. United States, 377 F.2d 300, 305 (5th Cir. 1967). See Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 35, 66 S.Ct. 861, 90 L.Ed. 1062, 1069 (1946). In view of these principles, it appears to us that the Commissioner's argument in this connection is based on semantical distinctions and not considerations of economic or legal substance. Hence, we conclude that the Tax Court's use of the economic interest test was not erroneous.[10]

■ As is always true in cases of this nature, a careful analysis of the facts is necessary to bring out the essential character of the transaction involved. A finding that an economic interest has been retained by the taxpayer must be supported by a showing of the following facts: (1) the taxpayer must have acquired by investment an interest in the minerals in place and (2) he must look solely to the extraction of the mineral for the return of his capital. Commissioner v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347, 353 (1956); Rhodes v. United States, 464 F.2d 1307, 1310 (5th Cir. 1972). Since there can be no serious question about the Vests' pre-agreement investment interest in the water rights and right of way, our chief concern here will be to assess the Vest-Shell agreement in light of the second part of the economic interest test.

10. We do not propose to delineate all of the possible ramifications, subtleties and intricacies of the economic interest test as it may be applied in numerous and varied transactions. It has wide application throughout many areas of tax law. We only conclude that the concepts developed with respect to the test constitute a valid and helpful analogy in the solution of the issue involved in this case.

We must here determine whether proceeds arising out of agreements calling for the exploitation of natural deposits will be considered ordinary income or whether they will be taxed as proceeds from the sale of a capital asset. Accordingly we ue the test as an aid in characterizing the transaction under consideration. See Wood v. United States, 377 F.2d 300, 304, 306 (5th Cir. 1967).

The case law relevant to this issue can be dichotomized into two broad yet distinct lines of authority: *sales* cases and *lease* cases. Rhodes v. United States, 464 F.2d 1307, 1310 (5th Cir. 1972); Wood v. United States, 377 F.2d 300 (5th Cir. 1967). As a general proposition, if a sale is consummated, the taxpayer divests himself of all economic interest in the minerals transferred and therefore is entitled to treat the proceeds as capital gain. By the same token, if the transaction is a lease or one where the taxpayer looks solely to the extraction of minerals for a return on his capital, then he must treat the proceeds as ordinary income. Rhodes v. United States, 464 F.2d 1307, 1310 (5th Cir. 1972); Rutledge v. United States, 428 F.2d 347, 351 (5th Cir. 1970). See also Commissioner v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347, 353 (1956).

An exhaustive review of the "sales" cases is not necessary in order to identify the factors which distinguish them from the "lease" decisions. While the presence of language of sale has always been considered relevant, it is well recognized in both lines of authority that the labels or words used by the parties in forming their contract are not controlling. In short, the substance of a contract's terms and provisions will prevail over its form. Rhodes v. United States, 464 F.2d 1307, 1311 n.4 (5th Cir. 1972); Rutledge v. United States, 429 F.2d 347, 352 (5th Cir. 1970) (lease case). Thus, since this court's decision in Crowell Land & Mineral Corp. v. Commissioner, 242 F.2d 864 (5th Cir. 1957), it has consistently been held that a sale results where an agreement purports to transfer within a prescribed time period *all,* Rhodes v. United States, 464 F.2d 1307 (5th Cir. 1972); Gowans v. Commissioner, 246 F.2d 448 (9th Cir. 1957); Day v. Commissioner, 54 T.C. 1417 (1970), or a *specific, predetermined* quantity of minerals in place, *Rhodes, supra,* Linehan v. Commissioner, 297 F.2d 276 (1st Cir. 1961); Gowans v. Commissioner, *supra,* in exchange for a fixed consideration.[11] *Rhodes, supra; Day, supra.* See also Bryant v. Commissioner, 399 F.2d 800, 806 (5th Cir. 1968); Commissioner v. Remer, 260 F.2d 337 (8th Cir. 1958). The economic effect of an agreement exhibiting these terms is abundantly clear. Not only does the transferor part completely with his interest in the minerals in place, he also acquires a right to receive payments which is not dependent upon extraction by the transferee. There is thus a cashing in of an investment interest and capital gain treatment of the proceeds is appropriate.

The Vest-Shell agreement, despite its language of sale, does not lend itself to

---

11. There are a number of other factors which have appeared in these cases but have not by themselves been considered of controlling importance one way or the other. Reverter provisions are one example. While generally more prevalent in leases than sales, they are not necessarily incompatible with the latter. It has been held that if all of a specific, predetermined quantity of minerals are transferred, that which reverts is not the remainder of the mineral deposit sold but rather the seller's right to possession of the land from which it was extracted. See Crowell Land & Mineral Corp. v. Commissioner, 242 F.2d 864, 866–867 (5th Cir. 1957); Don C. Day, 54 T.C. 1417, 1425–1426 (1970). Where a mineral deposit has been transferred to make way for the subsequent development of the land under which it lies, some courts have found that fact to be indicative of an intent to sell. See, *e. g.,* Rhodes v. United States, 464 F.2d 1037, 1311 (5th Cir. 1972); Linehan v. Commissioner, 297 F.2d 276, 277 (1st Cir. 1961). Finally, in the water rights cases, there is frequently a reservation by the transferor of a right to use water for certain purposes. Although in one case this reserved right was considered to be significant enough to affect the sales versus lease issue, Puckett v. Commissioner, 23 T.C.M. 238, 241 (1964), aff'd per curiam 355 F.2d 551 (5th Cir. 1966), that is not ordinarily the case. See Don C. Day, 54 T.C. 1417, 1424 (1970); Rev.Rul. 55–295. *Contra* Rev.Rul. 70–204.

easy categorization. It is a borderline transaction for tax purposes reflecting in varying degrees both sale and lease characteristics. Nevertheless, after an analysis of its terms and provisions as a whole, Albritton v. Commissioner, 248 F.2d 49, 51 (5th Cir. 1957), we cannot conclude that this agreement is controlled by *Crowell* and subsequent "sales" decisions. In our opinion the Vest-Shell agreement differs significantly from the transactions involved in those cases. Because of these critical differences we find that the Vests retained an economic interest in the water rights and right of way transferred to Shell.

Under the terms of the agreement, the Vests did not transfer to Shell all of the water in place or a specific quantity thereof. Though this fact alone represents a key difference from the "sales" cases, it takes on increased importance in light of other provisions in the agreement. These provisions indicate that Shell had no intention of making an outright purchase of water payable in any event. On the contrary, Shell acquired the water rights primarily for use when needed to provide sufficient reserves for the secondary recovery by oil by means of waterflooding.[12] While Shell was obligated to make payments to the Vests in monthly installments over a 75 year period, it is important that Shell controlled the conditions under which this obligation arose. Shell was under no duty to extract any "purchase price water" at all and if it did not, the Vests would receive nothing. We do not think that these terms are equivalent to the quid pro quo that has traditionally been associated with a bona fide sales transaction or a cashing in of one's investment interest in property.[13]

But having found that the Vest-Shell agreement is fundamentally unlike the transactions in the *Crowell* line of decisions involving what were determined to be sales, it does not automatically follow that the Vests retained an economic interest in the water rights. We still must inquire whether the Vests looked to the extraction of the water for a return on their capital. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Commissioner v. Southwest Explor. Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Rutledge v. United States, 428 F.2d 347 (5th Cir. 1970); Wood v. United States, 377 F.2d 300 (5th Cir. 1967); Albritton v. United States, 248 F.2d 49 (5th Cir. 1957). See also, United States v. White, 401 F. 2d 610 (10th Cir. 1968) (en banc). This is the critical determination. The language of the contract relevant to this point is clear and unambiguous. The Vests possessed the right to be paid a percentage of the proceeds received by Shell from the sale of all "purchase price water" which by definition included but was not limited to water actually extracted from wells situated on the Vests' property.[14]

We recognize that a "bare right measured by production does not constitute an economic interest," Commissioner v. Remer, 260 F.2d 337, 340 (8th Cir. 1958); Rutledge v. United States, 428 F.2d 347, 351 (5th Cir. 1970). But it is also true that "the question in all cases is what is owned by whom, or more exactly, what is the source of the right pursuant to which payments are received." Bryant v. Commissioner, 399 F.2d 800, 806 (5th Cir. 1968). Here we need only to emphasize what was pointed out earlier. The Vests' right to receive payments was

---

12. See note 1 *supra*.

13. In reaching this conclusion, we have, of course, taken into account (1) Shell's right to reconvey free of any further liability in the event that the "purchase price water" dropped below a certain level of output and (2) the Vests' reservation of a right to use such water as may be necessary for mineral exploration in their own right. Neither provision, in our opinion, is a controlling consideration to a proper disposition of this aspect of the case. See note 11 *supra*.

14. See note 3 *supra*.

linked inextricably to Shell's withdrawal of water or use of the pipelines. Without the occurrence of one or both of those eventualities, Shell incurred no liability whatever. This symbiotic relationship—between payments and production—is the kind of retained interest which makes the Vest-Shell agreement incompatible with a sale and more in the nature of a lease. Hence, we think the conclusion is escapable that the Vests retained an economic interest in the water rights transferred to Shell. It follows that the proceeds from this transaction were ordinary income and that the Tax Court's conclusion to the contrary was error.[15]

## II. Surface Rights

The second issue on this appeal concerns a lease agreement between the Vests and Standard Oil. Under its terms, the lease, which was executed in 1965, was to run for five years and as long thereafter as gas, oil and other minerals were produced from the land.[16] Paragraph 10 of this lease is the specific provision now in question; it required that Standard make payments to the Vests for well locations, tank batteries, flowlines and roads all of which were surface rights necessary to the exploration of the mineral rights acquired.[17] For the tax year 1965, the total amount of these payments was $33,422.[18]

The Vests assert that these payments should be given capital gain treatment because they were to last for an indefinite period and their purpose was to restore the depreciation in the surface value of the property caused by Standard's mineral exploration. We reject this argument on both scores.

First of all it is not entirely accurate to suggest that Standard's payments were to last for an indefinite period. Despite the fact that no one can say precisely when they will terminate, it is, nonetheless, indisputable that they will terminate eventually, if for no other reason, because of the exhaustion of the minerals subject to the Standard lease. The reason, of course, is that once this occurs the purpose of the surface rights will cease to exist. All payments would end and the surface rights would revert to the Vests or their successors in interest. In light of these considerations, the Vests' restoration of capital loss argument has a hollow ring.

A brief reference to Paragraph 10 of the lease serves to confirm these doubts.

15. The Vests contend that even if the proceeds from the water rights grant are found to be ordinary income, capital gains treatment should still be given to that part of the proceeds allocable to the right of way. But as we indicated earlier in note 2 *supra*, the grant of the right of way was a necessary part of this transaction, the primary purpose of which was to secure the water rights. Thus, under the circumstances of this case, there is no basis for treating each as a separate grant for income tax purposes.

16. Earl Vest, 57 T.C. 128, at 147 (1971).

17. The relevant portion of Paragraph 10 reads as follows:
It is understood and agreed that if and when exploratory, development or producing operations are conducted on the above described land, lessee, its successors and assigns, for the surface easement herein granted, shall pay to the surface owner at Kermit, Texas, on demand $150.00 per well location, $50.00 per tank battery site, $50.00 for each single shot hole, $150.00 for each multiple shot hole pattern in connection with seismograph or kindred operations on the land covered hereby, and $5.00 per linear rod for roads constructed and for pipelines laid (pipelines interconnecting storage tanks in the same tank battery and flow lines from a well to a tank battery at the site of that particular well shall not be considered pipelines for the purpose hereof).

18. Standard's payments were allocated in the following manner:
| | | |
|---|---|---|
| 1. Well locations at $150 each | | $ 1,650 |
| 2. Tank batteries at $50 each | | 100 |
| 3. Flowlines and Roads at $5 per rod | | 31,672 |
| | | $33,422 |

It reveals that Standard agreed to pay the Vests for all *actual* damage caused to the surface of their property, *independent* of its obligation to pay for the well locations, tank batteries, flowlines and roads.[19] Were we to accept the Vests' interpretation of this paragraph, it would mean either that the Vests were entitled to be compensated twice for capital loss or that Standard's duty to reimburse for actual damages were superfluous language without any legal significance. This position is patently untenable. We are compelled to conclude that Standard's payments for the surface rights were in the nature of rental income, Lindley's Trust No. 1 v. Commissioner, 120 F.2d 998, 1000 (8th Cir. 1941), and accordingly that there was no error in the decision of the Tax Court to this same effect.

The decision of the Tax Court is reversed in part and affirmed in part.

Reversed in part; affirmed in part.

---

19. Paragraph 10 states in relevant part: Payment of said sums shall be in full payment for the surface rights in connection with the herein enumerated operations, but, lessee, all successors and assigns, shall be and remain liable to the surface owner and to lessor for any actual damage caused by lessee, and all successors and assigns, to the surface of said land and water therein and thereon, grass, vegetation and growing crops thereon, and livestock operations thereon of the surface owner or occupier, occasioned by neglect or unreasonable use of said surface of the above described land, on demand, at Kermit, Texas, in the respective amounts above set out.