TOM LINEBERY AND EVELYN LINEBERY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8090–71.    Filed April 28, 1975.

*Wm. Monroe Kerr,* for the petitioners.
*D. Derrell Davis,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for 1967, 1968, and 1969 as follows:

| Year | Deficiency |
|------|-----------|
| 1967 | $6,038.16 |
| 1968 | 5,001.86 |
| 1969 | 9,556.29 |

Certain concessions having been made, the issues remaining for decision are as follows:

(1) Whether amounts received by petitioners from Shell Oil Co. for water rights and a right-of-way under an agreement executed in 1963 are taxable as ordinary income or as capital gain.

(2) Whether amounts received by petitioners from the extraction of caliche pursuant to conveyances executed in 1959 and 1960 are taxable as ordinary income or as capital gain.

(3) Whether petitioners properly valued land and a building thereon which petitioner Tom Linebery contributed to an exempt educational organization in 1969.

FINDINGS OF FACT

Petitioners Tom and Evelyn Linebery, husband and wife, were legal residents of Midland, Tex., when they filed their petition. They filed joint Federal income tax returns for 1967, 1968, and 1969 with the Director of the Internal Revenue Service Center at Austin, Tex.

Petitioners operate the Frying Pan Ranch, located in Winkler and Andrews Counties, Tex., and Lea County, N. Mex. The ranch is a partnership in which petitioners have a $\frac{3}{5}$ interest in the surface estate. At all relevant times herein, Evelyn Linebery was the trustee of the W. F. Scarborough Estate Trust, which holds the other $\frac{2}{5}$ interest.

## 1. *1963 Conveyance of Water Rights and Right-of-Way*

Winkler County is situated in a semiarid region which receives 10 to 12 inches of rainfall per year. It is part of a major oil-producing area, with hundreds of oil wells located in Winkler County alone. Among the geological features of the area is the Capitan Reef (sometimes hereinafter the reef), a highly permeable water-bearing coral formation which extends from an area near Carlsbad, N. Mex., into Lea County, N. Mex., then into Winkler County, Tex., and south. It extends north and south about 25 miles through Winkler County and extends east and west a distance of 5 to 6 miles. In Winkler County, the reef is about 2,000 feet beneath the ground surface for the most part, and is from 1,500 to 2,000 feet in thickness. Part of the reef underlies lands owned by petitioners.

The water reservoir in the reef is subject to recharge through outcroppings of the reef in Eddy County, N. Mex., located near Carlsbad.

Between 1948 and 1950, the oil industry began extensive use of waterflooding as a means of secondary recovery of oil in west Texas. Waterflooding is a process whereby water is injected into an oil-producing zone to force the movement of oil into the gathering or producing wells.

During 1962 and 1963, no large quantities of water, except for the reef water, were known to exist in Winkler County. The main interest in water for waterflooding is with respect to areas to the east, and some to the south, of the Capitan Reef.

Beginning in 1961, several companies opened negotiations with landowners in Winkler County, including petitioners, to obtain rights-of-way [1] from water wells located in the reef area, leading east to the oilfields where water was needed for secondary recovery operations. Shell Oil Co. (hereinafter Shell) commenced negotiations with petitioners and other Winkler County landowners in 1962 to secure rights to reef water as well as rights-of-way across their lands.

The negotiations with Shell were conducted by two attorneys, each representing a group of landowners, one group including petitioners, who owned land in the reef area and land between the reef and the oilfields. After protracted negotiations, an overall agreement was finally reached with Shell in April 1963 to grant to it water rights and the needed rights-of-way. Each owner executed a separate agreement covering his land, but all the agreements were similar in form.

On April 29, 1963, petitioners executed a document entitled "Conveyance," which recites that petitioners "have bargained, sold, granted, transferred, assigned and conveyed" to Shell the following:

(1) "All of the water rights between the depths of 3000 feet and 6500 feet beneath the surface into or under" certain portions of land in Winkler County, and fractional interests in other described properties in that county excepting "water necessary or required in connection with the exploration for and production of other minerals, including oil and gas," from lands covered by the grant and subject to certain other subsisting rights and privileges previously granted; and

(2) "A right of way along a route to be selected by Grantee to construct, lay, maintain, repair, operate and remove one trunk pipeline for the transportation and distribution of water over, through, upon, under and across" the described lands.

The conveyance provided that it was subject to all of the applicable terms and provisions of a "Sales Agreement" between petitioners and Shell, executed on the same date, and "in the event of any inconsistency between the provisions hereof and of the provisions of the said Sales Agreement, those of the said Sales Agreement shall control."

---

[1] Under the power of eminent domain, rights-of-way for the transportation of oil may be condemned, but no such power is available to oil companies for rights-of-way for the transportation of water unless they choose to become common carriers.

The contemporaneously executed sales agreement refers to the conveyance, described above, as the "Concurrent Conveyance" and to the right-of-way so conveyed as the "Trunk Line Right of Way." The sales agreement contains the following provision:

Shell desires to purchase water rights and a right of way on which to construct, operate and maintain a pipeline from Seller [petitioners]. Shell is purchasing these water rights primarily to obtain sufficient reserves to develop to provide water economically to be used in the secondary recovery of oil by means of water floods in various counties in and about Winkler, Ector and Ward Counties, Texas, and in such other endeavors as may from time to time require substantial quantities of water.

The sales agreement also provides that if Shell develops markets for water that may not be reached by the trunkline right-of-way, petitioners will grant additional rights-of-way across their lands at a specified price per rod. Similar roddage fees apply to any connecting pipelines constructed along routes not covered by the rights-of-way. As to the right-of-way specifically conveyed, the agreement provides:

Whenever Shell fails to use any part of a pipeline that is laid under the grants that are contained in CONCURRENT CONVEYANCE and this agreement, Seller may notify Shell in writing that unless Shell begins restoration or reuse of such pipeline within ninety (90) days the right of way for such part of the pipeline shall be forfeited and shall revest in Seller and if such a notice is given Shell's rights to that part of the right of way shall be forfeited unless it begins operations for the restoration or reuse of the said pipeline within the said period.

The agreement also recites that the consideration for the "sale to Shell of the water rights and the right of way for the Trunk Line" shall be the payment to petitioners of monthly installments "until the installment on account of water delivered during the month of December, 2038 A. D., shall have been paid" as follows:

Until a total of 1.4 billion barrels (42 U.S. gallons) of water shall have been covered thereby, the amount of each monthly installment of the PURCHASE PRICE shall be equal to 13⅙ percent of 3% of the amount which Shell shall have received during the preceding calendar month for Purchase Price Water [2] delivered or under "take or pay" provisions of agreements that it may

---

2 "Purchase Price Water" is defined as—
"the water produced from the water rights that are conveyed to Shell by CONCURRENT CONVEYANCE and/or from water rights that are acquired by Shell during, or as of a date in, or effective in, April 1963, from other parties and that are in lands in Winkler, Ward and/or Ector Counties, Texas, which water rights so acquired and so located are hereinafter referred to as "April Water Rights", and/or from water rights which Seller

make for the sale of such water; and, thereafter the amount of each monthly installment of the PURCHASE PRICE shall be equal to 13⅙ percent of 6% of the amount which Shell shall have received during the preceding calendar month for Purchase Price Water delivered or under the said "take or pay" provisions. * * * [3]

The agreement further provides that:

Shell's liability for the payment of each of the monthly installments of PURCHASE PRICE shall give rise to a separate and distinct liability which may be enforced as one or more of the monthly installments become due and remains unpaid, * * *

The agreement gives Shell an option to terminate its liabilities under the contract as follows:

If at any time the average daily quantity of Purchase Price Water * * * [or water derived from "other water rights"] delivered through all pipelines continues below 50,000 barrels for a period of six (6) months, Shell at its option may be released from its further liabilities for the PURCHASE PRICE * * * by reconveying to Seller, his heirs, successors or assigns, the water rights conveyed to Shell by CONCURRENT CONVEYANCE. * * *

And, finally, the agreement specifies:

Nothing except water shall be transmitted or transported through any pipeline covered hereby unless and until Shell shall have obtained the right to transport thereby other substances under the provisions hereof.

After concluding its transactions with the Lineberys and other landowners in April 1963, Shell constructed water pipelines extending from the reef into oil-producing areas to the east. The route Shell chose for the water-transmission line runs in an easterly direction from the reef area, crossing petitioners' land for about a mile and lands owned by three other families for approximately 25 miles until it reaches the Winkler County line. As of June 1974, Shell had drilled 17 water wells which are situated on 17 quarter sections of land covering the reef. Five of these quarter sections are located on petitioners' land, while 12

_____

[petitioners] under the provisions of Section 3(C) hereof elects to bring under the coverage of this agreement."

3 Payments for the water were first divided between one group of the landowners, which received 52.5 percent, and the other group, which received 47.5 percent, of the payments. The latter group—consisting of petitioners, the Vests, the Campbells, and the Amburgys—shared their aggregate percentage in the following manner: Petitioners were given a 13-⅙-percent interest, the Vests and the Campbells likewise received 13⅙ percent each, and the Amburgys received the remainder. While the method of allocation is unclear, it was based at least in part upon the location of the landowners' tracts with respect to the pipeline route and whether or not one's land contained water rights acquired by Shell.

are on land owned by the Waltons. As of December 31, 1973, 1,274,583,138 barrels of water had flowed through Shell's pipeline.

The parties have stipulated that all payments made by Shell from 1965 through 1969 were deducted each year by that company as a "water supply system expense."

On their joint Federal income tax returns for 1967, 1968, and 1969, petitioners reported receipts from Shell under the 1963 sales agreement as income subject to long-term capital gain treatment. In his statutory notice of deficiency, respondent determined that these amounts were taxable as ordinary income.

## 2. *Caliche Sales*

By deeds of conveyance dated January 10, 1959, and January 10, 1960, petitioners conveyed to certain construction companies surface interests in certain described tracts of land situated in Winkler County, Tex., and Lea County, N. Mex. Each deed expressly provides that the vendees (the construction companies) have the right to excavate and remove all soil, earth, and other material, including specifically caliche, from the tracts and to appropriate such to the vendees' unrestricted uses and purposes.

Each deed recites that it is made for and in consideration of the sum of $100, cash in hand paid, and for and in consideration of the "further and additional sums hereinafter provided to be paid by" the various vendees. With regard to the "additional sums," each instrument provides that the vendees agree—

as further consideration for the sale and conveyance of the above described tract of land to pay to Vendor [petitioners] the sum of Fifty Cents (50¢) per cubic yard for each and every cubic yard of earth, soil and other material excavated and removed from the above described tract of land. * * *

Each conveyance similarly provides also that:

If Vendees shall abandon the above described tract or if Vendees shall not excavate and remove any earth, soil or other material for a period of twenty-four (24) consecutive months, or if Vendees shall make default or breach of any of the conditions or covenants undertaken by Vendees hereunder and such default or breach shall continue for a period of sixty (60) days after notice by Vendor to Vendees of such default or breach, the interest hereunder sold and conveyed to Vendees shall ipso facto terminate and shall revert to and revest in Vendor, and Vendees further covenant and agree to execute and deliver to Vendor such conveyances and assignments as shall be reasonably required and requested by Vendor to give effect to this provision.

The conveyances also grant to the vendees an easement over petitioners' lands for ingress and egress to the tracts and a general warranty of title.

On their joint Federal income tax returns for 1968 and 1969, petitioners treated as long-term capital gain the amounts received for caliche under the conveyances described above. In his statutory notice of deficiency, respondent determined that all the amounts derived from sales of the caliche deposits were ordinary income.

### 3. Contribution of Land and Building

By deed dated December 12, 1969, Tom Linebery conveyed land and a building thereon, located in Kermit, Tex., to the College of the Southwest, Hobbs, N. Mex., an educational organization entitled, under section 501(c)(3) of the Internal Revenue Code of 1954, to exemption from taxation.

The building lot is irregular in shape and measures 25 feet in width, 98.7 feet in length on the south side, and 88 feet in length on the north side. Providing access to the property are three paved public roads located along the east, south, and west sides of the property, one of which is State Highway 18.

The building itself is constructed of hollow tile on a cement slab with a built-up roof containing steel beams every 4 feet. The front of the building is composed of 75-percent glass and 25-percent brick. It contains electrical and plumbing systems, an exhaust fan on the rear wall, and a lavatory. The dimensions of the building are 25 feet by 62 feet, or approximately 1,550 square feet.

Until the late 1960's, when Tom Linebery acquired title to the property, the building had been used as a meat market and was equipped with a front sales area, a storage area, and a walk-in cooler.

Tom Linebery acquired the property as a result of his guaranty of the original construction loan extended to a Mr. LeGrand by the Kermit State Bank (hereinafter bank). Upon LeGrand's default in payments, the bank called upon Linebery to perform his obligation as guarantor, which he did by paying the bank the balance of LeGrand's original obligation, together with insurance fees, giving Linebery an adjusted basis of $7,029.76 in the property.

After acquiring title, Linebery attempted to sell the property, albeit without success. Less than 1 year after taking title, he made the conveyance to the College of the Southwest, at which time the building was approximately 10 years old.

The instrument conveying the property to the College of the Southwest incorporated by reference certain restrictions with respect to the sale, storage, transportation, and/or consumption of alcoholic beverages on the property conveyed.

On their joint Federal income tax return for 1969, petitioners claimed a charitable contribution deduction in the amount of $14,164 for the donation. Respondent limited petitioners' charitable deduction to $7,029.76, an amount equal to Tom Linebery's adjusted basis in the property.

At the time of the conveyance, the building was unoccupied. No comparable sales of similar properties had taken place in the area around the time of the conveyance. The December 1969 replacement value of the building was approximately $11,700.

We find the fair market value of the building and lot at the date of the gift to be $9,000.

OPINION

### 1. *Water Rights and Right-of-Way*

In deciding whether the consideration received by petitioners for the water rights and right-of-way conveyed to Shell is taxable as capital gain or as ordinary income, we do not have a free hand. The Court of Appeals for the Fifth Circuit held in *Vest v. Commissioner*, 481 F.2d 238 (5th Cir. 1973), affg. in part and revg. in part 57 T.C. 128 (1971), cert. denied 414 U.S. 1092 (1973), that an almost identical transaction with Shell, entered into by Earl Vest and his wife, neighboring ranch owners, was in the nature of a mineral lease rather than a sale and that, consequently, the payments from Shell were taxable as ordinary income.

The Court of Appeals, acknowledging that the case involved a "borderline transaction," concluded (481 F.2d at 244–245):

The Vests' right to receive payments was linked inextricably to Shell's withdrawal of water or use of the pipelines. Without the occurrence of one or both of those eventualities, Shell incurred no liability whatever. This symbiotic relationship—between payments and production—is the kind of retained interest which makes the Vest-Shell agreement incompatible with a sale and more in the nature of a lease. * * *

After the instant case was tried in this Court, moreover, the United States District Court for the Western District of Texas granted the defendant's motion for summary judgment in an income tax refund suit brought by petitioners for another taxable period, *Linebery v. United States,* an unreported case (W.D. Tex. 1974, 34 AFTR 2d 74–6204, 74–2 USTC par. 9801), on appeal (5th Cir., Nov. 27, 1974). The District Court held that petitioners' receipts from Shell in respect of both the water rights and the right-of-way were taxable as ordinary income. That court concluded it was bound to follow the decision of the Court of Appeals in *Vest,* stating in a footnote that the Lineberys had acknowledged in their proposed findings of fact that "Except for names of the granting parties and descriptions of the land covered thereby, the instruments were the same and were evolved in the same series of negotiations" as in the *Vest* case.

Petitioners candidly concede that, in deciding the instant case, "this Court is constrained to follow *Vest,* as long as it stands," in cases which can be appealed to the Court of Appeals for the Fifth Circuit. See *Jack E. Golsen,* 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). However, petitioners state that in *Vest,* neither party argued the economic-interest test in the Court of Appeals but that court nonetheless used the test as the foundation of its reasoning. They contend that the Court of Appeals misapplied the test in reaching its conclusion, and they urge us "to recommend that the Court of Appeals for the Fifth Circuit overrule the *Vest* economic interest holding" in the light of *Anderson v. Helvering,* 310 U.S. 404 (1940), and *Charles Burke,* 5 T.C. 1167 (1945).

We are compelled to follow the *Vest* decision of the Court of Appeals, and we find nothing in *Anderson v. Helvering, supra,* or *Charles Burke, supra,* to aid petitioners' cause. In those cases, the transactions in question were treated as sales because the vendors of the mineral interests—a taxpayer-vendor retained a lien to secure the deferred payments in *Anderson,* and a taxpayer-purchaser gave the seller a similar lien in *Charles Burke*—were not required to look solely to extraction of the minerals for a return of their capital. The present case is not analogous to those factual situations.

True, in the instant case, the April 29, 1963, conveyance and sales agreement, described in our findings, entitled petitioners to

compensation even if no water was produced from their lands. Under the holding and rationale of the Fifth Circuit in *Vest,* however, such compensation was ordinary income, similar to rent, for the same reasons the water payments were ordinary income: (1) The payments were keyed to the use of the pipelines and measured by a percentage of the price for which Shell sold the water; (2) each monthly payment was a separate and distinct liability rather than a fractional part of a fixed sales price; (3) Shell obligated itself to make payments only if it used the right-of-way; (4) failure to use any part of a pipeline would subject the right-of-way for such part of the pipeline to forfeiture unless Shell restored and reused that part of the pipeline within 90 days; and (5) Shell assumed no unqualified obligation to produce or transport any water through the pipelines or to pay petitioners anything if it failed to do so. That petitioners were paid for the use of both the water rights and the right-of-way does not change to capital gain the character of any part of the payments.[4]

## 2. *Caliche Sales*

Petitioners contend that the contracts they executed with the several local construction companies for the removal of caliche from their lands were in essence sales of the minerals in place. Accordingly, petitioners argue that the payments they received should be taxed as long-term capital gain. Respondent maintains that the contracts constituted mineral leases and that payments thereunder are taxable as ordinary income.

We hold for respondent.

The issue as to whether payments received by taxpayers in consideration of the extraction and sale of so-called hard minerals from their lands are taxable as ordinary income or as capital gain has been before the courts on numerous occasions. See, e.g., *Rutledge v. United States,* 428 F.2d 347 (5th Cir. 1970); *Wood*

---

[4] The record in the instant case shows that the water in the Capitan Reef is subject to recharge through outcroppings of the reef in New Mexico and, therefore, is not a wasting asset. Cf. *Victory Sand & Concrete, Inc.,* 61 T.C. 407, 421–423 (1974). The reef thus differs from the unique Ogallala formation involved in *United States v. Shurbet,* 347 F. 2d 103 (5th Cir. 1965), and *Don C. Day,* 54 T.C. 1417 (1970), which is not subject to substantial recharge. On this ground, also, *Anderson v. Helvering,* 310 U.S. 404 (1940), and *Charles Burke,* 5 T.C. 1167 (1945), are inapposite.

Since the holding and rationale of the Court of Appeals in *Vest v. Commissioner,* 481 F. 2d 238 (5th Cir. 1973), affg. in part and revg. in part 57 T.C. 128 (1971), cert. denied 414 U.S. 1092 (1973), require the consideration for both the water rights and the right-of-way to be treated as ordinary income, we find it unnecessary to comply with petitioners' request that we allocate the monthly payments between the two rights.

*v. United States*, 377 F.2d 300 (5th Cir. 1967), cert. denied 389 U.S. 977 (1967); *Rabiner v. Bacon*, 373 F.2d 537 (8th Cir. 1967). In resolving this issue, the courts have consistently inquired as to whether the landowner retained an economic interest in the minerals in place, i.e., whether the taxpayer has:

(1) "acquired, by investment, any interest in * * * [the minerals] in place," and (2) secured by legal relationship "income derived from the extraction of * * * [the minerals], to which he must look for a return of his capital." * * *

*Commissioner v. Southwest Expl. Co.*, 350 U.S. 308, 314 (1956); *Wood v. United States*, 377 F.2d at 304. Such income from extraction is taxable as ordinary income. It is not derived from the sale of a capital asset.

We think it quite obvious that petitioners had an investment in the caliche deposits in place and that they were required to look solely to the extraction of that mineral for the recovery of their investment. Under the agreements, the various vendees did not receive an outright conveyance of the minerals. They were given the right to excavate and remove caliche from described lands, but that right would terminate if the vendees should abandon the described tract, if the vendees should fail to excavate and remove any material for 24 months, or if the vendees should default or breach any of the conditions or covenants of the contracts and such default or breach should continue for 60 days. If no material was extracted, petitioners would be paid nothing. For the material extracted and removed, petitioners would be paid 50 cents per cubic yard.

Quite clearly, the amount of the payment was dependent upon extraction, and only through extraction would petitioners recover their capital investment. *Rutledge v. United States, supra* at 352; *Wood v. United States*, 377 F.2d at 306; *Rabiner v. Bacon, supra* at 539. Petitioners' receipts from the caliche sales were ordinary income.

### 3. *Value of Land and Building*

On their joint Federal income tax return for 1969, petitioners deducted $14,164 as the value of the land and building donated to the College of the Southwest. Respondent allowed a charitable contribution deduction of only $7,029.76, an amount equal to Tom Linebery's adjusted basis in the property. In the light of the

record before us, we hold that the property had a fair market value of $9,000 at the time it was given to the college.

In arriving at this conclusion, we have taken into account all the facts of record: The replacement cost; the type of construction of the building; its physical condition and location; its accessibility to the public; the limited opportunities for renting it; the limited purposes for which it has been, or may be, used; the restrictions with respect to alcoholic beverages; and the other evidence in the case.

To reflect the foregoing,

*Decision will be entered under Rule 155.*