Lawrence E. GILBERTZ and Verna Ann Gilbertz, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C82–140–K.

United States District Court, D. Wyoming.

Nov. 18, 1983.

Claude M. Maer, Jr. and James A. Clark of Baker & Hostetler, Denver, Colo., for plaintiffs.

Ludwig H. Adams, Dept. of Justice, Washington, D.C., and Toshiro Suyematsu, Asst. U.S. Atty. for Dist. of Wyoming, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION

KERR, District Judge.

This is an action for the refund of federal individual income taxes for the year 1977. The parties have stipulated to a number of facts, relevant portions of which are presented below.

Plaintiffs are husband and wife engaged in the business of cattle raising on the Gilbertz Ranch in Campbell County, Wyoming. The ranch is comprised of two non-contiguous parts, a north portion consisting of 4,320 acres and a south portion consisting of 2,160 acres. Plaintiffs have title to the surface rights of both portions of land. The mineral rights are owned by the federal government, reserved in patents to plaintiffs' predecessors in title under the Stock Raising Homestead Act of 1916. Plaintiffs do hold a small percentage of the mineral rights. The federal oil and gas leases involving the Gilbertz Ranch were issued to private individuals and companies.

In 1977 various companies involved in activity on the Gilbertz Ranch made payments pursuant to agreements with the plaintiffs. The payments continue so long as there are oil and gas activities on the ranch. (In 1979 the activities were projected to last 15 to 50 years.) When production activity ceases, the structures and equipment of the oil and gas companies will be removed. Rehabilitation of the surface is required by agreements which all the oil, gas, and pipeline companies entered into.

The oil, gas, and pipeline activities have created more traffic, noise, and dust than previously evidenced on the ranch. After 1977 the number of cattle on the ranch was reduced 20%.

Taxpayers filed the appropriate income tax forms and paid the tax liability for the year 1977. In March 1981 they received a statutory notice of deficiency for the tax year 1977 in the amount of $37,557.00. They paid the alleged deficiency together with $9,314.66 for assessed interest and now claim a refund.

The parties agree that $3,860.00 worth of unreported ordinary income existed in 1977 and plaintiffs owe tax and interest on that amount.

There are three basic areas involving contract payments to the plaintiffs: (1) payment contracts with the mineral lessees; (2) payments from the pipeline companies for rights of way and damage; and, (3) payment for road right of way from Diamond Shamrock.

Beginning with the pipeline companies' payments, this Court must determine whether the rights of way granted to the pipeline companies are easements or licenses. If they are easements, they serve to create an interest in land and the payments under the agreements would be capital gain. If they are licenses, they are only personal property and the payments therefrom must be treated as ordinary income. While the language of an agreement is not binding in determining whether the right involved is an easement or license, it is one element, and there are several other factors which help guide the courts in making such a determination.

An easement is the right which one person has to use the land of another for a specific purpose. No title to the land is held by the owner of an easement, and an easement is not the land itself. An easement can be created by grant, implication, or prescription. When an easement is expressly granted (which may be accomplished by agreement), it should be done so in written and executed form. The words must show an intent to grant the easement. "If the contract is in form sufficient to pass an interest in realty, there appears to be sufficient ground for treating the right created as an easement or as in the nature of an easement." 25 Am.Jur.2d *Easements and Licenses* § 22, p. 434.

A license, on the other hand, is a privilege, personal, revocable, and unassignable. It is not created by grant and is not permanent; no interest in land passes. No formal language or writing is required. One requirement is assent by the licensor, which may be inferred by many acts. 25 Am.Jur.2d *Easements and Licenses* §§ 123–124, pp. 525–527.

Reviewing the elements of the right of way involved in this case, the terms of the contracts are considered. The contracts are for the most part titled "Right of Way Easement." Many are accompanied by a Release and Agreement whereby plaintiffs release all claims for damages against the pipeline companies (grantees) upon receipt of a set damage payment. Clearly, the terms of the contracts themselves provide that the rights of way are easements and the payments are a release of liability for damages.

Another factor to consider is the intent of the parties. It is certainly reasonable to assume that plaintiffs intended the rights of way to be easements and the payments to be for damages, since that is what they now contend. It seems reasonable to this Court to also assume that the pipeline companies intended to create easements and make advance payments for damages since they did so according to a contract which

specifically stated the agreement in those terms. This Court finds that the intent of the parties was to create easements and to make additional payments to release liability for damages.

The contracts were all in writing, signed, and notarized and, therefore, recordable as would be an interest in real property.

The contract agreements provide that the alleged easement would run with the land in that the documents provide that the right of way may be assigned in whole or in part. Furthermore, the contracts contain words of inheritance, i.e. "[t]he terms, conditions and provisions of this contract shall extend to and be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the parties hereto." These words make the right of way perpetual rather than reversionary which would signal the existence of a license. Granted, the easements will be extinguished upon abandonment; however, such a restriction is not unusual in grants of easement or in any other interest in real property.

Considering all of these elements together, the Court finds that as for the agreement (contracts) with the pipeline companies, the rights of way transferred were intended to be and are easements; an interest in real property, the proceeds from which are subject to capital gain treatment. Furthermore, this Court finds that since damages are allowed in the contract agreements, the additional payments made under the release agreements were indeed damage payments releasing the pipeline companies from any further liability for damages. The additional payments are *not* rent and, therefore, cannot be treated for tax purposes as ordinary income.

The next area considered by the Court is the payment for the road right of way from Diamond Shamrock. Analysis of the transaction and the resulting positions of the parties (Diamond Shamrock and plaintiffs) is very similar to the pipeline company transactions previously discussed. Defendant contends that the payment for the right of way is rent and, therefore, ordinary income for tax purposes. Taxpayers respond that the right of way is an easement subject to capital transaction treatment.

■ Plaintiffs and Diamond Shamrock entered into a written agreement titled "Surface and Damage Agreement." The agreement provides that since Diamond Shamrock must use a portion of plaintiffs' property to enter and proceed with drilling, damages entry and surface use will be arranged in advance. Within the language of the agreement, plaintiffs give, grant, and convey to Diamond Shamrock, its agents, employees, and assigns, a private right to enter upon and use the property of plaintiffs. Annual payment is to be made as an advance for damages and right of way use. The "easement" (as it is so termed in the agreement) will remain in effect so long as the payments continue. In addition to the payments provided for in the agreement to acknowledge damages for ordinary and reasonable use, the agreement also provides for additional compensation for plaintiffs' extraordinary losses, if any. Finally, in addition to the basic contract provisions, the agreement declares:

"This Agreement shall not be placed of record without the written consent of both parties. However, the parties agree to execute an appropriate 'Memorandum of Agreement' suitable for recording, and which may be recorded by either party ... In the event such 'Memorandum of Agreement' is placed of record, Operator agrees to execute and deliver to Owner upon termination of its oil and gas lease on the subject property, a quit claim and termination of the rights contained herein and under the 'Memorandum of Agreement' suitable for recording."

Viewed in light of the factors discussed previously, the same conclusion must result. Those facts indicate that an easement was intended and that an easement was created. The payments must be treated as capital gain.

■ The final area for this Court's consideration is the "release and damage" pay-

ments made by the mineral lessees. Once again, defendant contends that the payments are rent and thus subject to ordinary income treatment for tax purposes. Plaintiffs argue that the payments are releases of claims of damage to the land. In resolving this conflict, there are three elements for the Court's consideration: (1) the terms of the contract; (2) the intent of the parties; and, (3) the application of the precedent in *Vest v. C.I.R.*, 481 F.2d 238 (5th Cir.1973).

There are many different agreements involved, depending upon the lessee. The agreements are similar but not identical. Fixed payment periods are provided, and some of the contracts are between plaintiffs and assigns of the original lessee. Eighteen agreements with Davis Oil Company are entitled "Release and Damage Payment Receipts," three more are with Woods Petroleum Company, and one agreement is with Michigan-Wisconsin Pipeline Company. The agreements provide that plaintiffs acknowledge receipt of a specified sum "as full payment, settlement and satisfaction of all detriment, injuries and damages of whatsoever nature and character, growing out of, incident to, or in connection with the following described well ... caused by the moving in [etc.] ... and for the same consideration, [plaintiffs] does hereby release, acquit and discharge the said [lessee] of and from any and all claims for detriment, injuries and damages as set out above." An additional provision of the agreement sets forth:

"It is specifically understood that this payment covers all damages arising from the use of a well location and the road thereto, but does not include any damages to the personal property or other property of the [plaintiffs]."

The agreements themselves clearly indicate that the payments are agreed upon sums paid by the lessees and received by the plaintiffs as compensation for the damage caused or sure to be caused to the land. The "terms of the contract" leave one to conclude that the payments are for release of damages. There is no indication

in the terms of the agreement that the payments are for rental of the surface used.

Another important factor is the intent of the parties. Again, as noted in the previous section on easements, it is reasonable to assume that plaintiffs intended the payments to be in the nature of damages, since that is now their claim. This is true in spite of the evidence stressed by defendant, that "Mr. Gilbertz testified that in negotiating the payment amounts, no reference was made to the values of actual expected damage or the 'easements.' Instead, he simply tried to hold out for as much as he could get." Defendant's Post-Trial Memorandum, p. 11. That portion of Mr. Gilbertz' testimony stressed in plaintiffs' argument is "that his purpose in entering into the damage agreements with the oil and gas companies and the pipeline companies was to resolve in advance all disputes which could arise resulting from unreasonable and excessive use of the surface by these companies and for negligence in their operations ... he wanted the damage issue settled in advance so that he could concentrate on keeping his ranching operation going without having constant controversy with the various companies operating on his land about their constant use of the surface." Plaintiffs' Post-Trial Memorandum, pp. 1–2. This Court finds that plaintiffs intended the payments to be for damages.

It is also reasonable to assume that the lessees intended that the payments release them from liability for damages. They were party to an agreement that stated as much. Furthermore, it would appear to be as much to their advantage to avoid constant litigation as it was to plaintiffs. This Court finds that both parties to the agreements intended the payments to release the lessees from liability for damages. There is simply no indication that the payments were intended to be rent.

Finally, this Court will look for precedent to the case of *Vest v. C.I.R., supra,* cited by both parties. *Vest* was an appeal from the decision of Tax Court involving two

issues. One issue was the treatment of payments received for the grant of various surface rights incident to a mineral lease. The Tax Court determined that the payments were in the nature of rent and thus subject to tax treatment as ordinary income. This determination was upheld by the Fifth Circuit Court of Appeals.

The Vests owned their own mineral rights and entered into a lease agreement with Standard Oil. The lease contained a specific provision requiring Standard to make payments to the Vests for well locations, tank batteries, roads, etc., all of which were surface rights necessary to the exploration of the mineral rights. The lease further provided for payment (by Standard) of actual damages caused to the surface, independent of the payments for well locations, roads, etc. The Vests claimed that the payments were to last an indefinite period and would restore surface depreciation. The Fifth Circuit held that while it was uncertain how long the payments would last, they would eventually terminate and all surface rights would revert back to the Vests. The Court also relied heavily on the fact that additional payments were to be made for actual damages. If the payments for use of the surface are to compensate for damages rather than merely rental payments, then the Vests would be receiving and Standard would be paying double damages. The Court concluded that the payments for surface rights were in the nature of rental income.

While the result in *Vest* would appear to apply to this case, there are several considerations which make the cases distinct. The Gilbertzes are not the owners of the mineral rights under their land. The lessor of the mineral rights in this case was the federal government; the Gilbertzes were not involved in the lease agreements and had no "bargaining power" or other input into the terms and requirements of the leases. As carefully argued in plaintiffs' brief, the Gilbertzes had no right to demand any type of rental payment; the lessees were entitled to be on the land as necessary to develop the mineral rights.

Even in the interest of public relations, it is unlikely that the oil companies would pay for a right they already had.

It is true that as in the *Vest* case, the payments to the Gilbertzes will eventually terminate. However, they continue as long as the lessees remain on the land presumably causing damage to the surface. This Court will not use the eventual termination of the payments alone to hold that the payments made by lessees were rent and not damages.

Lastly is the issue of additional damage provisions in the agreements. Defendant argues that the damage provisions in the agreements which plaintiffs entered are comparable to the one in the *Vest* case. This Court does not agree. In the easement agreements there are provisions for damages; however, most of those agreements are accompanied by a release agreement protecting the pipeline companies from further liability upon plaintiffs' receipt of a specified sum, that sum presumably to cover liability for the stated damages. The release agreement prevents the plaintiffs from enforcing in separate and subsequent litigation the damage portion of the easement agreement. There is no opportunity for double recovery for damages in this situation.

There is also a separate damage provision in the Release and Damage Payment Receipt which plaintiffs executed with the lessees; however, it states only that damages to personal property or other property (not included in the surface involved in the use of the well location) is not covered by the payment made. This does not give rise to a situation where the possibility of double compensation for surface damages exists. The double recovery element evident in the *Vest* case is simply not present here.

Based upon the comparison of the *Vest* case, the intent of the parties, and the terms of the agreements, this Court concludes that the payments made by the mineral lessees to the plaintiffs provided a release from liability for surface damages

relating to the development of the mineral rights, and not in the nature of rent.

This memorandum constitutes the findings of fact and conclusions of law and additional findings and conclusions are unnecessary.

Judgment will be entered in accordance with this memorandum.